THE UNITED STATES, AT RELATION OF AARON GOODRICH, PLAINTIFF IN ERROR, *v.* JAMES GUTHRIE, SECRETARY OF THE TREASURY.

The circuit court of the United States for the District of Columbia, had not the power to issue a writ of *mandamus,* commanding the secretary of the treasury to pay a judge of the territory of Minnesota his salary, for the unexpired term of his office, from which he had been removed by the President of the United States.

No court has the power to command the withdrawal of money from the treasury of the United States, to pay any individual claim whatever.

A *mandamus* can issue only in cases where the act to be done is merely ministerial, and with regard to which nothing like judgment or discretion, in the performance of his duties, is left to the officer.

The question, whether or not the President has power to remove a territorial judge, argued, but not decided in the present case.

THIS case was brought up, by writ of error, from the circuit court of the United States for the District of Columbia, holden in and for the county of Washington.

The facts were these : —

On the 19th March, 1849, the President appointed, by and with the advice and consent of the senate, A. Goodrich, to be chief justice of the supreme court of the Territory of Minnesota, for four years, which appointment was accepted.

On 21st of October, 1851, the President of the United States thought proper to remove Mr. Goodrich, and to appoint Jerome Fuller to the office ; of which removal Mr. Goodrich was informed by an official letter from the department of state, dated 22d October, 1851, and received by him on 30th November, 1851, as stated by him.

Mr. Goodrich denied the power of the President to remove him from office during the term of four years, and claimed his salary from and after his removal. The accounting officers of the treasury paid him his salary up to 30th November, 1851, and refused to pay beyond that day.

Mr. Goodrich moved the circuit court of the United States for the District of Columbia and county of Washington, for a rule upon the secretary of the treasury, to show cause why a *mandamus* should not issue, to compel the payment of the salary to Mr. Goodrich, up to 19th March, 1853, when the term named in his commission expired. The court refused to grant the rule.

From this refusal, Mr. Goodrich brought the case up to this court, by writ of error.

It was argued by *Mr. Lawrence*, for the plaintiff in error, and by *Mr. Cushing*, (attorney-general,) for the defendant.

*Mr. Lawrence* contended : —

1. That the President had not the power to remove the relator, during the four years from his appointment.

2. That the *mandamus* prayed for was the appropriate remedy.

The argument of *Mr. Lawrence* will be given as a reply to *Mr. Cushing*.

*Mr. Cushing* argued : —

1. The power of removal; 2. The propriety of the *mandamus*.

1. As to the power of removal.

The statute creating the supreme court for the territory of Minnesota was approved 3d March, 1849 ; to be found in 9 Stats. at Large, 406, ch. 121, § 9.

The power of appointing the justices of this territorial court is vested in the President, by and with the advice and consent of the senate, (by § 11.)

The statute does not authorize appointment during good behavior, but expressly limits it to four years.

The commission to Mr. Goodrich follows the statute, and is limited to four years from the day of the date, 19th March, 1851.

By the constitution of the United States some offices are for a term of years, and some are during good behavior, which, in contemplation of law, is for life. The President and Vice-President are elected for four years, senators for six, and members of the house of representatives for two years. Judges, both of the supreme and inferior courts of the United States, are to be

appointed for life or during good behavior; for life and for and during good behavior being synonymous in law. But all civil officers, whether holding for years or for life, "shall be removed from office on impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors." The house of representatives have the sole power of impeachment; the senate have the sole power to try all impeachments.

Such being the theory of the constitution of the United States, the question arose at the first session of the first congress under the constitution, as to the President's power of removal of all officers whose tenure of office was not, by the constitution itself, declared to be during good behavior.

That important question was discussed by men of eminent learning and patriotism, composing the first congress under the federal constitution. The opinions of the distinguished men who then composed the house of representatives, have been reported, (4 Elliott's Debates, Part II. 141–208.) The senate then sat with closed doors, so that the debates in that house are not reported.

The debate upon the President's power of removal from office arose upon the bill for establishing the executive department, denominated the department of foreign affairs. This power of removal from office, in all its aspects and bearings under the constitution, was discussed in the house of representatives, until the subject was exhausted. The power of the President to remove all officers, who, by the constitution itself, were not declared to hold their offices during good behavior, was sustained by both houses; they concurred in passing an act constituting the department of foreign affairs, which was approved by President Washington, on 27th July, 1789, in the 2d section of which the President's power of removal is acknowledged, (1 Stats. at Large, 29, ch. 4, § 2.)

So likewise in the act constituting the war department, approved 7th August, 1789, (same volume, p. 50, ch. 7, § 2.). So also in the act constituting the department of treasury, approved 2d September, 1789, (same volume, p. 67, ch. 12, § 7.) So likewise in the act constituting the navy department, approved by President Adams, 30th April, 1798, (same volume, p. 554, ch. 35, § 1.) And also in "An act to establish the post-office of the United States," approved 2d March, 1799, (same volume, p. 733, ch. 43, § 1.) And in the act establishing the home department, approved 3d March, 1849, (vol. 9, p. 395, ch. 108, § 1,) it is enacted, that the secretary of the interior shall be appointed by the President, by and with the advice and consent of the senate, "who shall hold his office by the same tenure * * * as the secretaries of the other executive departments.

It appears from the published debates in the house of representatives, (in the year 1789, before alluded to,) that the principal difference of opinion between the members of that house, was, whether the power of removal from office belonged to the President alone, or to the President and senate. By some it was thought that, as the advice and consent of the senate was necessary to the appointment, it should also be necessary to the removal. But it was answered, that the senate had no power to nominate, to appoint, or to commission; that the power to nominate, to appoint, and to commission, was with the President; that after the senate had advised and consented to a nomination, the President could decline to grant a commission, and nominate another for the office; that the senate had no means to compel the appointment, or the retainer in office, of any particular person, where the office was within the gift of the President; that appointment and removal were strictly executive powers, by and under the constitution; that the constitution vested the executive power in the President; that the legislative power and the executive power could not be blended any further than was expressly permitted by the constitution; and, finally, that if the senate were to be consulted, — and, in case of recess, to be convened, — the remedy would be too dilatory and incomplete, and the proper responsibility of the President would be dissipated.

The construction of the constitution, as concurred in by the two houses of the first congress, and approved by President Washington, resolved these points : —

1. That in a republican government public offices are created for the benefit of the people; that the officer does not hold a private estate and property in the office, and when the officer is unfit, for any cause whatever, he ought to be displaced, and another appointed for the benefit of the people and their security; or, if the office itself be found, upon experience, to be unnecessary, it should be abolished.

2. That the constitution contains the power of removal, otherwise the declaration that the judges should hold their offices during good behavior would have been unnecessary and tautologous. The express declaration that the judges shall hold their offices during good behavior, necessarily implies that the other officers shall not hold during good behavior, but at will, *durante bene placito.*

3. That the power of removal from office is incident to the power of appointment.

4. That the power of impeachment was a compulsory mode of getting rid of officers guilty of high crimes and misdemeanors, the favoritism of the executive notwithstanding.

5. That impeachment was not, and ought not to be, the only mode of removing officers; for whilst a mere intention to commit a high crime or misdemeanor is not a ground of impeachment, yet a fixed design in an officer to commit a misdemeanor in his office ought to be hindered from consummation by a timely removal. Moreover, there are various causes, short of the crimes and misdemeanors upon which impeachment may be grounded, which are sufficient to loosen the confidence of the President and the community in the officer; and, therefore, good reasons why he should be removed, such as insanity, incompetency, inattention, bad habits, or ill-fame.

6. That the duty imposed by the constitution on the President, to "take care that the laws be faithfully executed," absolutely requires that he should have the power of removing unfit, negligent, disobedient, or faithless officers; that without the power of removal, the President would be without the means of performing the duty of causing the laws to be faithfully executed; and if he had not the means, he could not be justly held responsible for his failure.

8. That, if impeachment was the only mode by which improper officers could be removed, the remedy, in by far the greatest number of instances, would be inadequate, too slow, too expensive, and the government be impracticable, inefficient, and incompetent to the purposes and ends for which it was instituted.

9. That, in so far as the executive power of removing all officers not holding by the constitution during good behavior had been conferred on the President by the constitution, such his constitutional power could not be impaired by the legislature; nothing but an amendment to the constitution could take it from him.

(*Mr. Cushing* then argued that this construction of the constitution had been sustained by this court, and referred to the case of *ex parte* Hennen, 13 Pet. 230, 259. He then contended that territorial judges were not judges within the third article of the constitution; but that they came within the clause giving to congress power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States; and, also, within the 18th paragraph of the 8th section of article 1st, giving to congress the power to make all laws that may be necessary and proper, &c., &c.; and then proceeded): —

It seems to be well settled, not only by the action of congress, but by the decisions of the supreme court of the United States, and otherwise, that the various persons appointed to judicial functions by the President of the United States are distinguished

The United States v. Guthrie.

into two great classes, so far as regards the present question, namely, the judges of constitutional courts, and those of legislative courts.

Constitutional courts are such as are intended by the provisions of the third article of the constitution. The judges of this class, by the express terms of the constitution, hold their offices during good behavior. It comprehends the judges of the supreme court, and of the various judicial circuits and districts into which the United States are subdivided.

Legislative courts are such as congress establishes, not under the third article of the constitution, but either in virtue of the general right of limited sovereignty which exists in the government, or of some specific power in the constitution other than that above cited. Thus it has been adjudged that the jurisdiction, with which the courts of the territories are invested, is not a part of the judicial power which is defined in the third article of the constitution, but is conferred by congress, in the execution of those general powers which that body possesses over the territories of the United States. American Insurance Co. v. Canter, 1 Pet. 511, 546. See also State of Pennsylvania v. Wheeling Bridge Co. 13 How. 518, 563. In accordance with which doctrine, it is held that the judges of the territorial courts are not subject to impeachment and trial before the senate of the United States, (Mr. Grundy's opinion, 1st February, 1839,) and are subject to removal from office at the discretion of the President of the United States. Mr. Crittenden's opinion, 23d January, 1851.

The action of congress, as already intimated, has been in accordance with these views of the constitution. In many cases it has given to the judges of the territories a tenure of four years, subject, of course, to removal by the President, (Louisiana, 2 Stats. at Large, 284; Arkansas, 3 Ib. 495; Florida, 3 Ib. 657; Iowa, 5 Ib. 238; Minnesota, 9 Ib. 406; New Mexico, 9 Ib. 449; Utah, 9 Ib. 455,) though in one case at least it has been a tenure by good behavior. Wisconsin, 5 Stats. at Large, 13.

In the older cases, reference was made to the ordinance of July 13, 1787, one of the earliest acts of congress; that of August 7, 1789, having for its object to adapt the provisions of that ordinance to the constitution; and the same power of appointment and removal was thereby given to the President as had previously belonged to the United States in congress assembled. Northwest Territory, 1 Stats. at Large, 52; Illinois, 2 Ib. 614; Indiana, 2 Ib. 59; Mississippi, 1 Ib. 550.

On the face of things, this might seem to have been a tenure by good behavior, because such is the language of the ordinance of 1787; but as, by the constitution of the confederation, all the

powers of the government were vested in the congress, that body decided the question of good behavior for itself, and had the power of removal upon its own estimation of what constituted misbehavior.; and that precise power was, by the act of 1789, conferred on the President of the United States. In all these acts, at any rate, it has been assumed that the tenure was not that of the constitution, as provided by it for the depositaries of the proper judicial power of the United States, it being, on the contrary, either the general tenure of ordinary officers, or else such definite tenure as in the particular case congress might see fit to prescribe; in doing which, congress obviously recognized the fact that it was not a judicial tenure by virtue of the constitution.

(*Mr. Cushing* then enumerated a long list of acts passed by congress in conformity with the above views, and then proceeded : —)

From the year 1804 to this time, during a period of fifty years, we have the concurring opinions and acts of eight congresses and seven Presidents of the United States, that the judges of the courts of the territorial governments are not within the third article of the constitution, declaring that the judges therein referred to shall hold their offices during good behavior; but that the territorial judges may, rightfully, and without any violation of the constitution, be appointed to hold their offices for four years only.

The supreme court of the United States have also concurred in that construction of the constitution.

In the case of The American Insurance Co. *v.* Canter, 1 Pet. 511, 546, the court decided that these territorial courts " are not constitutional courts, in which the judicial power conferred by the constitution on the general government can be deposited. * * * * They are legislative courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables congress to make all needful rules and regulations respecting the territory belonging to the United States. The jurisdiction with which they are invested is not a part of that judicial power which is defined in the third article of the constitution, but is conferred by congress in the execution of those general powers which that body possesses over the territories of the United States. * * * * In legislating for them (the territories) congress exercises the combined powers of the general and of a state government."

Under the government of the United States there are no common law offices, no offices whose tenures depend upon ancient usage.

All offices under the government of the United States are

created, either by the law of nations, such as ambassadors and other public ministers, or by the constitution and the statutes. As to ambassadors and other public ministers, the usage of nations determines the tenure of their commissions to be at the will of the appointing power.

If the heads of the executive departments could hold their offices for life, against the will of the President, and in despite of the differences of opinion between him and them as to public measures, policy, and principles, the power of the President would be feeble, incapable of causing the laws to be faithfully executed. There would have been but little use in limiting the term for which the President is elected to four years, if the heads of the executive departments, when once appointed, held their offices for life. A President elected for the term of four years, surrounded by heads of the departments holding their offices for life, removable only by impeachment for, and conviction of, high crimes and misdemeanors, would be a chief in name only, but not in power, not justly responsible to the people if the laws were not faithfully executed. To elect a President for the term of four years, while the heads of the executive departments must be appointed for life, would show a want of adaptation of the parts to each other, a senseless combination of destructive inconsistencies, an absurd incongruity.

The constitution has avoided such confusion. Where it has intended that officers shall hold their offices during good behavior, it has so declared; and in so selecting particular classes of offices to be holden during good behavior, it has virtually announced that the others shall be removable at the will of the appointing power. The usage of the government, the construction of the constitution from its beginning, the concurrent opinions of all the departments of the government, has been so. The decisions of the supreme court, before cited, (1 Pet. 511, and 13 Ib. 230,) seem to be conclusive against the claim of the plaintiff, Goodrich.

The general rule, "that an office is held at the will of either party, unless a different tenure is expressed in the appointment, or is implied by the nature of the office, or results from ancient usage," is stated by the supreme court of the United States, *ex parte* Hennen, 13 Pet. 260, and references are there given to the judicial decisions of state tribunals, fortifying that construction of the constitution of the United States.

All public officers, whether for life, or for a term of years, or at will, are subject to an implied condition, that the officer shall well behave. But the condition, that the officer *bene se gesserit*, does not give an officer appointed for a term of years, a tenure *quamdiu se bene gesserit*. A condition of good behavior, and a

tenure during good behavior, are distinct things. The condition for good behavior is necessarily implied, and adheres to every officer. The tenure during good behavior belongs only to those officers in whose commissions that tenure is expressed.

Officers who are neither by the constitution, nor by the law creating the offices, directed to be commissioned during good behavior, hold their offices at the will of the appointing power. Such is the established doctrine as to the tenure of offices under the government of the United States, settled by the concurrent opinions of the legislative, the executive, and the judicial departments, by contemporaneous construction, by long and general usage of all the executive, legislative, and judicial departments of the government.

2. Had the circuit court for the District of Columbia the power to grant a *mandamus* in this case against the secretary of the treasury?

It devolves upon the party demanding the exercise of a power to show that it exists. The English cases cited and relied upon have no applicability, because the United States courts are not clothed with the same powers as the King's Bench. While that court exercises all power, except where specially limited, the United States courts can only exercise such as are specially conferred. States often confer very plenary powers upon their high tribunals. Congress has been sparing in conferring them upon national tribunals. It has nowhere conferred what is now claimed. No authority has been given to institute suits against the government while this proceeding, in effect, commences one, tries it, gives judgment, and awards execution without appearance or the intervention of a jury to settle facts. It seeks to reverse the decision of the accounting officers, and to compel the secretary to violate the law, by forcibly taking from the treasurer and paying out, without conforming to the provisions of the statutes. Before Goodrich's account is settled by the accounting officers, the secretary cannot issue his warrant on the treasurer for the amount claimed; and, without such warrant, the treasurer could not pay. The secretary cannot compel the comptroller to allow the account, nor the treasurer to pay without a warrant properly signed, certified, and recorded. To accomplish his object, Goodrich should have made the auditor, comptroller, secretary, treasurer, and register parties, so as to compel each to perform his respective duty under the acts of congress. In stating accounts of judges, the accounting officers rely upon evidence from the proper department, as to who is commissioned, and are not at liberty to dispute it. In this case, the appropriations had been applied in paying those who had the usual commissions. All these officers, except the register and treasurer, must exercise their

discretion and judgment, and are responsible to the President for their proper exercise. No case can be found where it has been held that a judicial tribunal can control either, or compel either to act contrary to his best judgment.

The 14th section of the judiciary act of 1789, 1 Stats. at Large, 81, clothes the United States courts with power to issue writs necessary for the exercise of their respective jurisdictions, but for no other purpose. In Smith *v.* Jackson, 1 Paine, 453, 455, THOMPSON, J., held that this power must be strictly followed, and that the circuit court had not the superintending authority of the King's Bench in England. The same principle was established in McIntyre *v.* Wood, 7 Cranch, 504, the court refusing to compel a register of a land-office to perform a specific duty. In this case it was stated, by JOHNSON, J., that the circuit court could not compel a collector of customs to grant a clearance. This principle was sustained and affirmed in McClung *v.* Silliman, 6 Wheaton, 598; 1 Kent, Com. 322; Bovier, L. D. 7, title *mandamus;* and McElrath *v.* McIntyre, 1 Law Rep. N. L. 399.

It has been repeatedly held that a *mandamus* cannot be granted to compel the performance of an executive act, as this most clearly is. Decatur *v.* Paulding, 14 Pet. 497; 1 Blond, 186, 189, 584; Bordley *v.* Lloyd, 1 H. and McH. 27; Runkle *v.* Winemiller, 4 Ib. 429; Wittions *v.* Cadman, G. and J. 184; Elliott *v.* The Levy Court, 1 H. and McH. 559; Brashears *v.* Mason, 6 Hawk. 92 – 102.

In Kendall's case, it was held that where a mere ministerial act was involved, under an express statute, a *mandamus* could issue, but not when judgment or discretion were to be exercised in determining upon a matter of fact or of law. In the present case, the treasury officers passed upon the questions, whether Goodrich was in office, and whether there was money appropriated to pay him. This court cannot, on this application, review their decision. If it could do so, it might do the same in every case of contested action by the executive departments, which would bring the whole government under the control of the judiciary. Such a result would be at war with fundamental principles of our institutions, and destroy their harmony and usefulness. There is no authority for making the United States a party defendant in a suit, except when conferred by statute.

The common law of Maryland does not confer any such power, nor is it found in any statute. The present proceeding is, in substance and effect, a suit against the United States, and intended as such. Its object is to assert a private right against it, and compel payment out of the treasury; and it is, therefore, unauthorized. McKim *v.* Odum, 3 Bland's Ch. R. 420 – 423,

25*

424. Opinion of Attorney General 507 – 510, 1066, 1103, 1303, 1425.

The treasury cannot be reached by compulsory proceedings against its officer. A prosecution against him must be personal, and can affect him only, and cannot affect the property of the government; for a suit against him, the property of the United States cannot be controlled. The court cannot compel him to take its property and confer it upon another. The property of a principal can never be taken in a suit against the custodian or agent. If this could be done, a court could compel A to take the property of B, and deliver it to C, to pay a debt due from B to C. The power now set up has never been vested in any judicial tribunal, nor lawfully exercised by one. If sustained, it would enable the judiciary to control the operations of the treasury, and render the government powerless, even in time of war, by directing its application.

The argument of *Mr. Lawrence*, in reply, was in substance as follows : —

Two questions arise in this case, both of which are of great importance : First, whether the President had power to remove the relator, during the four years for which he was appointed; and, secondly, if he had not, whether a *mandamus* is proper for the purpose, and under the circumstances stated in the petition.

I shall endeavor to maintain that the President, in this instance, had not the power of removal. If we take the literal terms of the law constituting the judges of Minnesota, they are peremptory and unmistakable. They " shall hold their offices for the period of four years." If we refer to the commission of the relator, it pursues the very words of the law. The acceptance of the office was upon the terms and conditions of the act of congress and of the commission. Were there nothing then but the act of congress involved in this case, it would be a waste of words to argue that upon the language of that act the relator was entitled to hold his office for the entire term of four years, subject only to the power of impeachment.

But the attorney-general contends that, no matter what may be the construction of the act of congress, the executive power is lodged in the President, by the constitution, and that the power of removal, being incident to the power of appointment, which is an executive power, is itself therefore an executive power, and consequently cannot be taken from the President, in any case, by congress, and that the territorial judges not being judges the tenure of whose office is defined by the constitution, they were within the control of executive power; and that such has been the construction of all departments of the government from the beginning.

Now, sir, I maintain the direct contrary of this doctrine. I insist that congress has the power to define the tenure of any office not defined and fixed by the constitution, and that this is a matter of philosophical and political necessity arising from the very nature of legislative functions. And that as to the power of removal in the case of judicial officers, the executive, legislative, and judicial construction has been against it.

But before proceeding to the exact question involved, I wish to notice the case of the American Insurance Co. *v.* Canter, 1 Pet. 540, which has been made the groundwork of the supposed power of removal in the case of territorial judges.

Now, all that the court decide in that case is, that the judges of the territorial courts of Florida were not "constitutional judges," that is, that they were not judges of those courts to which the judicial power spoken of in the constitution was committed, for if they had been they would have held their office "during good behavior;" but that they were legislative judges, created by virtue of the power given to congress to make all needful regulations for the territory of the United States.

But what countenance does this decision give to the power of removal by the President? All that decision affirms is, that territorial judges do not derive their existence from the constitution; if they did, they would necessarily hold their office during good behavior, and congress could not limit or abridge their term of office. In other words, if they are the judges designated in the constitution, they hold their office during good behavior, in spite of congress or the executive, because the constitution, the instrument of their existence, says so. But where in this decision is found any warrant for holding that a legislative judge, shall not hold his office during the term of four years, when the act of congress, the instrument of his existence, says he shall so hold? The judges in either case are just what the instrument to which they owe their origin makes them; in the one case, during good behavior; in the other, during four years. And it is no more within the power of any third party to remove the incumbent in the one case than in the other. In each case, the President, by and with the advice of the senate, has the power of appointment. In each case the power of appointment having been executed, the President is *functus officio*, the constitution in the one case, and the act of congress in the other, clothing these officers with their respective powers, qualities, and immunities.

There is another idea which has been rather hinted than expressed, that the judges of the territorial courts are mere executive officers, created under the clause of the constitution

which gives power to congress to make rules respecting the territory of the United States, and are therefore not within the saving influence which protects judicial officers. As I have not seen this doctrine in the works of any respectable writer, or heard it from the lips of any respectable speaker, I will only say that if their character were not to be pronounced from the nature of their functions, but from the character of the body to which that power is committed, and from which they derive their existence, then they are legislative officers, and not executive officers, because it is to congress and not to the President, that the power of making rules respecting the territory of the United States has been committed.

I now come to the main question in the case. Can congress create an office and define the tenure thereof? By the constitution all the legislative power of the federal government is committed to congress, and by the last clause of the 8th section of article 1, all the residuary or discretionary power of the general government is also lodged in congress. The legislative is the only creative element in our government, and precedes in logical succession as well as in actual experience the action of the other departments, inasmuch as they only act upon that which the legislative power has brought into existence. The functions of the legislature are originative, those of the judiciary expository, and those of the President executory. The one gives birth to that which the other expounds and explains, and the third, when understood and explained, carries into effect. To create an office, then, is in its nature a legislative function. And to define and fix the tenure of an office which is in the process of creation, is also in its nature a legislative function. And of course it would be comprehended in the grant of " all the legislative power," unless expressly withheld, or impliedly denied by the grant of some directly repugnant power to some other department. And it is insisted by the attorney-general that the grant of the executive power to the President is thus repugnant to the power in congress to fix the tenure of an office.

But what is executive power with reference to the government of the United States? It is not executive power in the abstract. It is not the executive power of the Emperor of Morocco or the Sultan of Turkey, but it is such executive power as rises out of the constitution and laws of the United States. It is exactly the power, in any given case, of carrying the particular law, as it stands, into execution. In the instance of the judges of the United States courts, the constitution having fixed the tenure, the executive power consists in the power of appointment without the power of removal. So, too, where the legislatures from great motive, of public policy, creates an office with a fixed and

The United States *v.* Guthrie.

determinate tenure, the executive power, as to that law, consists in the power of appointment only, without the power of removal. And this is the necessary result of the very structure of our government. The sovereignty of the United States is an unit. The government of the United States is one government. The departments are but functionaries of that government; not hostile to each other, but coördinate; separate, but not antagonistical. When, therefore, either of the departments acts in its legitimate sphere, it is the sovereignty of the United States which acts through its appropriate functionary. If congress pass an act, it is the act of the government of the United States, by its appropriate organ. If the judiciary expound a statute, it is the exposition by the government through its peculiar organ, of its own enactment. But the attorney-general says that he does not recognize this "unitarian government;" that he looks into the constitution of the United States, and discovers only three distinct and separate departments. Beyond that he does not look.

This view of the case imposes upon me the inquiry, what is a constitution? Is it the government, or is it the organic law by which the government acts? Is it any thing else than a charter, in which are laid down the functions, the powers, and the duties of the mere organs or instruments of the government? In a pure democracy, a constitution is an absurdity. In an absolute despotism, a constitution is an absurdity. Because, in either case, the power which acts is absolute, and being the only power which can make the constitution, it can disobey it or annul it, and there is nothing beyond it to impose on it the necessity of obedience to its own rules. It is only in a representative government that a constitution properly finds a place. It is only where the sovereign power does not immediately govern, but acts through others who represent that sovereign power, that a constitution becomes necessary, in order to define how far and in what the sovereign power is committed to such agents or representatives. In so far as the power is given to them, their acts are the acts of the sovereignty, but no further. There is still a power behind the constitution which, as it made it, can also unmake it. And, sir, there is a sovereignty behind the constitution of the United States — a power which, as it made, can unmake that. It is that sovereignty, that power, which is represented, not constituted, by the different departments as laid down in the constitution. When, therefore, the congress passes an act within its prescribed sphere, it is the sovereignty of the United States which passes that act by its appropriate department. And so with the other branches of the government. I repeat, then, that the sovereignty of the United States is an unit, and

that the different departments are but different organs of one and the same government. And when "the executive power" is committed to the President, it is, in any given case, only that power which is necessary in order to carry the particular law into execution. And instead of the grant of the executive power being a limit to, or abridgment of, the legislative power, the former is only a consequence or result of the latter, it being only the power of carrying the law which the legislature has made, and as it has made it, into execution. And such has been the construction practically. The great debate in 1789 has been misapprehended by the attorney-general, and by others before him. The question involved in that debate was not whether the President had the power of removing an officer, the tenure of whose office was fixed by law; but whether he had such power when the law was silent as to the tenure. The debate arose upon the necessity of inserting the words, " to be removable by the President," &c., and it was argued that the power of removal was incident to the power of appointment, where no statutory limitation existed, and that therefore it was unnecessary to insert those words. But it was nowhere intimated that when the law fixed the tenure the President could remove; or that congress, whenever public policy should require, could not effectually fix the tenure of an office which it could create. On the contrary, it was distinctly asserted by many, and treated as a *concessum* by all, that congress could make the tenure what it pleased. The debate, too, had reference to a purely executive office, and much of it was spent upon the question, whether, if the power of removal was incident to that of appointment, the President and senate, and not the President alone, should remove. And the main argument for the President's power was his responsibility for the acts of purely executive officers, who were his agents,— an argument which could not extend to judicial officers. I humbly submit, then, that this great debate, instead of being a foundation for the doctrine set up by the attorney-general, when rightly understood, only goes to the extent that an executive officer, whose term of office is not limited by law, holds at the pleasure of the President. And from that time to this, the executive construction has been that territorial judges could not be removed, and they have been treated as exempt from the President's power.

The legislative construction has been the same. There has been one uniform current of legislative acts, in which the tenure of the territorial judges has been fixed. And it is not unworthy of consideration that the very congress of 1789, in about one month after the debate I have referred to, gave their legislative exposition of the power of congress to fix the tenure of office,

when they enacted, in the act passed to adapt the ordinance of 1787 to the constitution of the United States, that in all cases where, under the ordinance, the congress had had the power of removal, the President should thereafter have that power. 1 Stats. at Large, 53. Now, the ordinance had limited the tenure of the judges to good behavior, and of course the above act, therefore, conferred no power on the President to remove them. And for fifty years, through successive enactments, this policy as to judicial officers, has been followed by congress, and has been sanctioned by the public sentiment in its favor.

The judicial construction has been the same. As long ago as the case of Marbury *v.* Madison, 1 Cra. 154, it was decided that where the tenure of an office was fixed, the President had no power over the officer. In that case, justices of the peace were appointed by the President under the act of congress of 1801, by which act they were to hold their offices for five years. The court decided that Marbury, when once appointed, had a right to the office for the five years prescribed by law, independent of the executive. The case is exactly analogous to the present. In both, the tenure was fixed, for a term of years, by an act of congress. But how does the attorney-general deal with this decision? Why, forsooth, he says it is an *obiter dictum*, not necessary to the decision of the case. But, sir, I maintain that it was in no just sense an *obiter dictum*. It was the very case itself. It was ably argued, and solemnly considered and decided by the whole court. But more than this, it has stood unreversed for more than fifty years, and has, by reiterated reference and recognition, become embalmed in the jurisprudence of the country. It has been woven into the very fabric of our state and federal authority, and you might as well tear the woof from the warp as to wrest this case from its place in the unwritten law of this land. And, moreover, this court has again recognized the same principle, in the case of Hennen, 13 Pet. 258, 259. And I conclude, then, that not only is it philosophically true that the legislative, which is the only creative, originative department of the government, has the power to define and fix that which it creates, and that the executive power is only the United States executing that which the United States, by its congress, has enacted; but that, in relation to judicial officers, the united construction of all the departments has rested in the same conclusion.

II. The second question is, whether a *mandamus* is the proper remedy?

If it is not, then the relator, although illegally deprived of his office and its emoluments, is utterly without remedy; and not only may the executive officers of the government deprive an

individual of his rights, but may, in the very act, violate both the constitution and the laws of the United States, and yet this wrong cannot be remedied. For even an impeachment does not restore the individual to his rights.

The fact, then, that the relator is without any other legal remedy, is of itself good ground for a *mandamus* where the right is clear. Tappan on Mandamus, pp. 5, 9, 10.

It is no objection that the *mandamus* is to compel the payment of money, if there are no other means of compulsion. 3 Nev. and Perry, 280; 8 Ad. and Ellis, 176; 4 Barn. and Ad. 360; 6 Bing. 668.

In the present case the act was purely ministerial; not a particle of discretion was to be exercised. By the 11th section of the act of congress, (9 Stats. at Large, 407,) each judge was to receive an annual salary of $1,800, to be paid quarterly, at the treasury of the United States. An appropriation has in each year been made for the payment of these judges. See 9 Stats. at Large, 532, 611. The salary was fixed by law, the time of payment fixed, the place of payment fixed, and the money lay in the treasury appropriated for that payment. Could there be a more absolutely ministerial act or duty than that of the secretary in making the payment? See the case of Kendall, 12 Pet. 612, 613.

But the attorney-general says that the secretary of the treasury was, in this instance, to exercise judgment and discretion in looking into the act, and determining its meaning. But this is no more than saying that the act was addressed to a being with intellectual faculties. For if no act can be ministerial merely because it requires to be understood in order to be performed, then no act of a rational being can ever be ministerial. The true question is, not whether it requires judgment, discernment, or any other intellectual quality, in order to understand what is to be done by the requirements of the statute, but whether the officer has any discretion to exercise between doing, and not doing, what the statute commands. If the statute is imperative, there is no room for judgment as to the performance of the act which the statute requires, however much of judgment, in another sense, or of understanding may be requisite in arriving at the meaning of the law. True legal discretion is a discretion to do or not to do, according as the judgment of the officer may decide; and that discretion can never be exercised when the statute has peremptorily ordered a thing to be done.

This case is clearly distinguishable from Paulding v. Decatur, 14 Pet. 497, and Brashear v. Mason, 6 How. 92.

In each of those cases there was a fair case for discretion to

be exercised, both in regard to the real meaning of congress, and, also, in regard to the fund out of which the money was to be paid. Nor is this but an indirect mode of suing the government, which it is forbidden to do directly. This proceeding is neither to establish a claim by the judgment of a court, nor to enforce against the government the payment of a claim. The government has, by its proper legislative department, the only department which in this particular province represents the government, declared that the judges of the Minnesota territory shall receive a certain salary, to be paid quarterly at the treasury. It is the secretary of the treasury, and not the government of the United States, that refuses to pay; and the *mandamus* is to command him, not as the representative of the government to make this payment, but as the mere officer on whom devolves the duty of executing this law, which the government, by its legislature, has passed, to do what the law specifically requires.

Mr. Justice DANIEL delivered the opinion of the court.

This case comes before us upon a writ of error to the circuit court of the United States for the District of Columbia and county of Washington. It originated in the denial, by the court above mentioned, of a writ of *mandamus*, by which the secretary of the treasury should be ordered to pay to the relator a sum of money claimed by the latter as a portion of the salary due to him as chief justice of the territory of Minnesota.

The facts which constituted the grounds of the application, few and simple in their character, were these:—

That on the 19th of March, 1849, the relator had, with the advice and consent of the senate, been commissioned, by President Taylor, chief justice of the supreme court of the territory of Minnesota, to which office there had been annexed (by the act of congress organizing the territorial government) a compensation or salary of eighteen hundred dollars per annum, payable quarter-yearly. That the tenure of the appointment was, by the language both of the act of congress, and of the commission of the relator, declared to be for the term and duration of four years from the date of the commission. That the relator, having accepted his commission was, afterwards, namely, on 22d of October, 1851, informed by J. J. Crittenden, acting secretary of state, that the President had thought it proper to remove him from office, and to substitute in his place Jerome Fuller.

That the relator, insisting upon the tenure of his office according to the literal terms of the commission, preferred a

claim before the first auditor of the treasury for the sum of
$2,343, as compensation, from the period of his dismission,
up to the expiration of four years from the date of his ap-
pointment.

That the first auditor having rejected the claim in these words :
" That Aaron Goodrich is not entitled to the salary claimed by
him," an appeal was taken by the relator to the comptroller of
the treasury, by whom the decision of the first auditor was sus-
tained, and by whom, in adjudging, it is remarked, that " There
can be only one chief justice of the supreme court in the terri-
tory ; and the President of the United States having thought
proper to remove Chief Justice Goodrich, and having nomi-
nated, and, by and with the consent of the senate, appointed
Jerome Fuller chief justice, in the room and stead of the said
Chief Justice Goodrich, he, that is, the comptroller, was bound
to consider the said removal and appointment as legal."   And in
consideration of the facts and the law, his decision was, that
the United States were not indebted to the said Aaron Good-
rich, as chief justice of the supreme court of the territory of
Minnesota, and that the decision of the first auditor in the
premises was confirmed and established.

Upon the foundation of the facts above recited, and in oppo-
sition to the decisions of the auditor and comptroller, and with
the view of coercing the allowance, by the secretary of the
treasury, of the claim preferred by the relator, the application,
which has been refused by the circuit court, was made.

In considering this case, it may be remarked, at the threshold,
that it exhibits the anomalous predicament of a prosecution by
and in the name of the United States, adversary to the United
States and to their authority ; for it must be admitted that the
secretary of the treasury can have no relation whatever, and is
clothed with no powers and sustains no obligation incident to
the present controversy, except as he is the representative of the
United States, or the guardian or custodian of their interests,
committed to his charge.

In their discussion of this cause, the counsel on either side
have deemed themselves called upon to take a more extensive
range of inquiry, than is that by which we consider this contro-
versy to be properly limited.   They have supposed that, in the
regular line of this controversy, and, therefore, in its correct
adjudication, were involved, necessarily, the tenure and charac-
ter of the judicial power, as created either by the constitution
or by the legislation of congress ; as likewise the powers of the
executive department, in the exercise of its constitutional func-
tions, to control or influence the judicial power ; and in their
examination, by the counsel, of these deeply-important topics,

much of research and ingenuity has been evinced. But, within what we conceive to be the correct apprehension of this cause, neither of those important topics is embraced; and although, when regularly and directly presented for consideration, the responsibility of passing upon them can no more be avoided than can the adjudication of any minor subject of judicial cognizance, yet their very importance furnishes a cogent reason why any unauthorized proceeding, in reference to them, should be cautiously avoided; why there should be no attempt to affect them by proceedings extrajudicial in their character, and such as would deprive of binding authority the action of the court, in matters even of trivial concernment.

The true question presented for our consideration here, relates neither to the tenure of the judicial office, as created and defined by the constitution or by acts of congress, nor to the powers and functions of the President, as vested with the executive power of the government.

The only legitimate inquiry for our determination upon the case before us is this: Whether, under the organization of the federal government, or by any known principle of law, there can be asserted a power in the circuit court of the United States for the District of Columbia, or in this court, to command the withdrawal of a sum or sums of money from the treasury of the United States, to be applied in satisfaction of disputed or controverted claims against the United States? This is the question, the very question presented for our determination; and its simp. statement would seem to carry with it the most startling considerations — nay, its unavoidable negation, unless this should be prevented by some positive and controlling command; for it would occur, à priori, to every mind, that a treasury, not fenced round or shielded by fixed and established modes and rules of administration, but which could be subjected to any number or description of demands, asserted and sustained through the undefined and undefinable discretion of the courts, would constitute a feeble and inadequate provision for the great and inevitable necessities of the nation. The government under such a regime, or, rather, under such an absence of all rule, would, if practicable at all, be administered not by the great departments ordained by the constitution and laws, and guided by the modes therein prescribed, but by the uncertain, and perhaps contradictory action of the courts, in the enforcement of their views of private interests.

But the question proper for consideration here has not been left for its solution upon theoretical reasoning merely. It has already been authoritatively determined.

The power of the courts of the United States to command

the performance of any duty, by either of the principal executive departments, or such as is incumbent upon any executive officer of the government, has been strongly contested in this court; and, in so far as that power may be supposed to have been conceded, the concession has been restricted by qualifications, which would seem to limit it to acts or proceedings by the officer, not implied in the several and inherent functions or duties incident to his office; acts of a character rather extraneous, and required of the individual rather than of the functionary.

Thus it has been ruled, that the only acts to which the power of the courts, by *mandamus*, extends, are such as are purely ministerial, and with regard to which nothing like judgment or discretion, in the performance of his duties, is left to the officer; but that, wherever the right of judgment or decision exists in him, it is he, and not the courts, who can regulate its exercise.

These are the doctrines expressly ruled by this court, in the case of Kendall v. Stockton, 12 Pet. 524; in that of Decatur v. Paulding, 14 Pet. 497; and in the more recent case of Brashear v. Mason, 6 How. 92; principles regarded as fundamental and essential, and apart from which the administration of the government would be impracticable. These principles, just stated, are clearly conclusive upon the case before us. The secretary of the treasury is inhibited from directing the payment of moneys not specifically appropriated by law. Claims against the treasury of the United States, like the present, are, according to the organization of that department, to be examined by the first auditor; from this officer they pass, either under his approval or by appeal from him, to the comptroller; and from the latter they are carried before the secretary of the treasury, without whose approbation they cannot be paid, and who cannot, even by the concurring opinions of the inferior officers of the department, be deprived of his own judgment upon the justice or legality of demands upon public money confided to his care. Opposed to the claim under consideration, we have the decisions of three different functionaries; to each of whom has been assigned, by law, the power and the duty of judging of its justice and legality. By what process of reasoning, then, the authority to make those decisions, or those decisions themselves, can be reconciled or identified with the performance of acts merely ministerial, we are unable to conceive; and unless so identified, or there could have been shown some power in the circuit court competent to the repealing of the legislation by congress, in the organization of the treasury department — competent, too, to the annulling of the explicit rulings of this

court, in the cases hereinbefore cited — the circuit court could have no jurisdiction to entertain the application for a writ of *mandamus* in this instance. As no such powe has been shown, nor, in our opinion, could have been shown, or ever had existence, the decision of the circuit court, overruling the application, is approved and affirmed.

Mr. Justice McLEAN dissented. Mr. Justice CURTIS filed a separate opinion; in which Mr. Justice NELSON, Mr. Justice GRIER, and Mr. Justice CAMPBELL concurred.

Mr. Justice CURTIS.

I assent to the judgment of the court in this case, upon the ground that a writ of *mandamus* to the secretary of the treasury is not a legal remedy, to try the title of the relator to the office claimed by him; and that, until that title has been legally tried and determined, he can take no step to compel the payment of the salary attached by law to that office. I desire to be understood as expressing no opinion upon any other question argued by the counsel in this case.

Mr. Justice NELSON, Mr. Justice GRIER, and Mr. Justice CAMPBELL concurred in this opinion.

Mr. Justice McLEAN.

As this case involves important principles, and as I differ from the opinion of the court, I shall state my views.

The first inquiry that naturally arises in the case is, whether the President had power to make the removal complained of? This is not the object of the *mandamus* applied for, but it is incidental to it.

The 2d section of the 2d article of the constitution provides: "That the President shall have power, by and with the advice and consent of the senate, to appoint ambassadors, other public ministers and consuls, judges of the supreme court and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law."

In his argument, the attorney-general says: "That the power of the President was discussed and settled by congress, in the commencement of the federal government; that the power of the President to remove all officers, who, by the constitution itself, were not declared to hold their offices during good behavior, was sustained by both houses; and that this power was recognized in the establishment of the department for foreign affairs."

26 *

In the 2d section of the act referred to it was provided: When the principal officer of the department should be removed, the chief clerk, during the vacancy, shall have custody of the records of the department. And a similar provision is contained in the other acts to establish the principal departments of the government. The heads of these departments constituted the cabinet of the President; and, as they were not only his advisers, but discharged their duties under his direction, there was a peculiar propriety that their offices should be held at the will of the executive.

There was great contrariety of opinion in congress on this power. With the experience we now have, in regard to its exercise, there is great doubt whether the most enlightened statesmen would not come to a different conclusion.

The attorney-general calls this a constitutional power. There is no such power given in the constitution. It is presumed to be in the President, from the power of appointment. This presumption, I think, is unwise and illogical. The reasoning is: the President and senate appoint to office; therefore, the President may remove from office. Now, the argument would be legitimate, if the power to remove were inferred to be the same that appoints.

It was supposed that the exercise of this power by the President, was necessary for the efficient discharge of executive duties. That to consult the senate in making removals, the same as in making appointments, would be too tardy for the correction of abuses. By a temporary appointment the public service is now provided for in case of death, and the same provision could be made where immediate removals are necessary. The senate, when called to fill the vacancy, would pass upon the demerits of the late incumbent.

This, I have never doubted, was the true construction of the constitution, and I am able to say it was the opinion of the late supreme court, with Marshall at its head.

The numbers of the Federalist though written before the constitution was adopted, have been considered as among its ablest expositors. Publius, in one of his numbers, says, " It has been mentioned as one of the advantages to be expected from the coöperation of the senate, in the business of appointments, that it would contribute to the stability of the administration. The consent of that body would be necessary to displace as well as appoint. A change of the chief magistrate, therefore, would not occasion so violent or so great a revolution in the offices of the government, as might be expected if he were the sole disposer of offices: where a man in any station has given satisfactory evidence of his fitness for it, a new President would be restrained

from attempting a change in favor of a person more agreeable to him, by the apprehension that the discountenance of the senate might frustrate the attempt, and bring some degree of discredit upon himself. Those who can best estimate the value of a steady administration, will be most disposed to prize a provision which connects the official existence of public men, with the approbation or disapprobation of that body which, from the greater permanency of its own composition, will in all probability be less subject to inconstancy than any other member of the body."

In this discussion, in congress Mr. Madison, one of the ablest and most enlightened statesmen of which our country can boast, considered the removal from office was an executive power, and that congress could not restrict its exercise. He also considered the power of appointment an executive power, and that, had not the constitution so provided, the concurrent action of the senate could not have been required by act of congress in making appointments. If this were admitted, it would not give strength to the argument in favor of the exercise of the power by the President.

If the power to remove from office be inferred from the power to appoint, both the elements of the appointing power are necessarily included. The constitution has declared what shall be the executive power to appoint, and by consequence, the same power should be exercised in a removal. But this power of removal has been, perhaps, too long established and exercised to be now questioned. The voluntary action of the senate and the President, would be necessary to change the practice; and as this would require the relinquishment of a power by one of the parties, to be exercised in conjunction with the other, it can scarce'y be expected.

The attorney-general says, that "the construction of the constitution concurred in by the two houses of the first congress and approved by President Washington, resolved, among others, the following point: —

"That in a republican government, public offices are created for the benefit of the people; that the officer does not hold a private estate and property in the office, and when the officer is unfit, for any cause whatever, he ought to be displaced, and another appointed for the benefit of the people and their security; or if the office itself be found, upon experience, to be unnecessary, it should be abolished." The soundness of the policy expressed in this resolution, must be admitted by every intelligent individual who understands and appreciates our system of government; and if the power had been exercised under the limitations expressed in the resolution, it would have had a

most salutary effect on office holders, and on the public. For the truth of this a reference may be made to the history of the earlier administrations.

But this power of removal from office by the President, was neither exercised nor supposed to apply until recently, to the judicial office.

In the establishment of the territories, the " Northwestern," " Indiana," " Illinois," " Mississippi," " Michigan," and " Wisconsin," it was provided that the judges should hold their offices during good behavior. The governor, secretary, and the other officers of these territories were appointed, under the law, for a term of years, " unless sooner removed."

By the act of congress of August, 1789, to provide for the government of these territories, certain changes were made in the ordinance of 1787, to adapt it to the constitution of the United States. It was provided that the President shall nominate and by and with the advice and consent of the senate, shall appoint, all officers which by the said ordinance were to have been appointed by the United States in congress assembled; and all officers so appointed shall be commissioned by him; and all cases where the United States, " in congress assembled, might, by the said ordinance, revoke any commission or remove from any office, the President is hereby declared to have the same power of revocation and removal."

In the territories of " New Orleans," " Florida," " Iowa," " Oregon," " Washington," " Utah," " New Mexico," " Minnesota," " Nebraska," and " Kansas," the judges were appointed for four years; and the governor and all other officers of the territories were appointed for a term of years, " unless sooner removed."

In the " Missouri " and " Arkansas " territories only, were the judges appointed for four years, " if not sooner removed."

In the constitution, no express provision was made for the government of territories. This, no doubt, was deemed unnecessary, as the ordinance of 1787, which was passed before the constitution was adopted, provided for the government of all the territory then claimed by the United States.

Territorial judges are said not to be appointed under the constitution, but by virtue of an act of congress. In the American Insurance Company *v.* Canter, 1 Pet. 546, Chief Justice Marshall said: " The judges of the superior courts of Florida held their offices for four years. These courts, then, are not constitutional courts, in which the judicial power, conferred by the constitution on the general government, can be deposited." But all the judges of the territories, from 1787 to 1804, were appointed for good behavior, so that the term of service was not a safe criterion by which to determine the character of territorial judges.

It is admitted that the judges of the supreme court cannot be appointed for a less period than good behavior; and the same may be said of the district judges.

The power under which the territorial governments is organized, is a matter of some controversy. In the case above cited, Chief Justice Marshall said: "Florida continues to be a territory of the United States, governed by virtue of that clause in the constitution which empowers congress to make all needful rules and regulations respecting the territory or other property belonging to the United States." This is the prevailing view of those who have examined the subject. But the chief justice proceeds: "Perhaps the power of governing a territory belonging to the United States, which has not, by becoming a State, acquired the means of self-government, may result necessarily from the facts that it is not within the jurisdiction of any particular State, and is within the power and jurisdiction of the United States. These facts exist in every territorial government, but it does not show the source of the power, unless by the doctrine of necessity, which does not seem to be a legitimate foundation for a civil government under our system. The chief justice further says: "The right to govern may be the inevitable consequence of the right to acquire territory." There is no special power given in the constitution to acquire territory. This does not seem to have been within the view of the framers of the government; and the right was much contested in the acquisition of Louisiana, when the power was first exercised.

It seems to me that the power to govern a territory is a necessary consequence of the power given "to make all needful rules and regulations respecting the territory or other property belonging to the United States." No one doubts the power of congress to sell the public lands beyond the limits of any State; and this renders necessary the organization of a government for the protection of the persons and property of the purchasers. This is an implied power, but it necessarily results from the power to sell the public lands.

It is difficult to say that any power can be exercised by congress, which is not derived from the constitution. Without that instrument, it is as powerless as any other association of men. The laws of the Union protect our commerce wherever the flag of the country may float, and, in some instances, our own citizens may be made responsible for acts done in foreign seas and countries; but this is the exercise of powers given by the constitution. Under the legislative power of congress, territorial governments are organized, and their functionaries are appointed by the President and senate. Their laws emanate from congress, or are passed by a territorial legislature, subject

to the approval of congress. The government of the territory is a government of the United States ; and although its courts do not exercise the judicial power to ·the same extent as the other courts of the United States, still, they are courts of the United States, and exercise such judicial powers as are conferred on them by law.

It is argued that, as the President is bound to see the laws faithfully executed, the power to remove unfaithful or incompetent officers is necessary. · This may be admitted to be a legitimate argument, as commonly applied to executive officers. My own view is, that the power to see that the laws are faithfully executed, applies chiefly to the giving effect to the decisions . of the courts when resisted by physical force. But however strongly this may refer to the political officers of the government, how can it apply to the judicial office ?

In. the nature of his office, the President must superintend the executive department of the government. But the judiciary constitutes a coördinate branch of the government, over which the·President has no superintendence, and can exercise no control. So far from this department being subject to the executive, t may be· called to pass on the legality of his acts. The President, like all the other officers of the government, is subject to the law, and cannot violate it with impunity. He is responsible for the infraction of private rights, and before a territorial court, the same as before the other courts of the Union. In no just and proper sense can the President be required to see that the judicial power shall be carried out, except as controlling the physical power of the Union.

The effects of the control of the judicial, by the executive power, are seen in the history of England, during the reign of the Stuarts. The most insupportable tyranny and corruption were realized under this paramount power of the executive government. It has always been the corrupting power of all free government. This, in a great degree, arises from the extent . of its powers and patronage. And in the formation of our government great care was taken to place the judicial power on . an independent basis. Being without patronage, and discharging the most onerous and delicate duties, nothing but a high and an impartial discharge of its functions can sustain it.

Whenever any portion of the judicial power shall become subject to the executive, there will be an end of its independence and purity. It will become the register of executive decrees and of a party policy. What could create a deeper degradation than to see any branch of ·the judiciary, which stands between the executive power and the rights of the citizen, become the mere instrument of that power.

There can be little or no difficulty in coming to a correct conclusion ón this important question, by an examination of the acts of congress creating the tenure of the judicial office in the territories. In the seven territories first enumerated, the judges were appointed during good behavior; the other officers were appointed for a term of years, " if not sooner removed."

In ten territories the law authorized the appointment of judges for the term of four years, and the other officers, for a term of years, " if not sooner removed." Whether in the above acts the judicial tenure was fixed for good behavior or a term of years, no one can fail to see the difference in regard to the tenure of the judges, and of the other officers. The judges were appointed absolutely for good behavior, or a term of years, whilst the other officers were appointed for a term of years, " unless sooner removed." By the terms of the appointment the political officers, such as the governor, secretary, marshal, &c., were removable, but the judges were not. In this respect these appointments stand in contrast, and show the unmistakable intention of congress.

It is true that for the territories of Missouri, and Arkansas, the judges were appointed for the term of four years, " unless sooner removed." This language was first used for the Missouri territory, and as the Arkansas territory was taken from Missouri, the same language was incorporated into the organic law of Arkansas. These two territories out of the nineteen above named, would imply the power to remove the judges. But whether this language was the result of accident or design, it cannot authorize the construction of the law establishing the other territories, among which the territory of Minnesota is included, as though the power of removal applied to them. The words used will not allow this construction, especially when taken in connection with the words in the same acts in relation to the appointment of officers in the territories, other than the judges.

This view is greatly strengthened by the usage of the government. There have been, it is believed, but two judges of territories removed, and those recently, since the organization of the Union. And we may rely on the early practice of the government, to show its true theory, in the exercise of federal powers. The great principles of our system were then understood and adhered to, and our safest axioms are found in this part of our history.

It is said the act of 1789, which modified the ordinance of 1787, so as to adapt it to the constitution, gave the same power to the President, in regard to appointments and removals which, under the confederation, was exercised by congress. This is'

true, but it can apply only to those officers which, under the confederation, were removable by congress. Under the ordinance, as above stated, the judges were appointed during good behavior, while all the other officers were appointed for a term of years, "unless sooner removed."

If congress have the power to create the territorial courts, of which no one doubts, it has the power to fix the tenure of office. This being done, the President has no more power to remove a territorial judge, than he has to repeal a law. The duties of a judge of a territory are discharged as independently, and as free from executive control, as are the duties of a judge of this court. This territorial judicial power was intended to be a check upon the executive power. And it would be inconsistent with the principles of our government, for the judges to be subject to removal by the executive.

This is a great question, although it can only effect, as now maintained, the territorial bench. And I regret that, from the want of jurisdiction, in the opinion of my brethren, they are not required to express an opinion as to the power asserted.

The other question in the case is, whether the remedy by *mandamus* is appropriate and legal. In the case of Kendall *v.* the United States, 12 Pet. 608, which, in my judgment, is not distinguishable from this, the question was settled.

In that case, under a special act of congress, a matter of controversy between William B. Stokes et al. and the postmaster-general, was referred to a commissioner, to examine the account and report any balance he might find due to the relators, from the post-office department; and the postmaster-general was required to pay such balance, by entering a credit on the books of the department.

The duties of the commissioner were performed, and he reported in favor of the relators, $161.563.89, all of which sum was credited by the postmaster-general, except the sum of $39,462.43, which he refused to place to the credit of the relators, on the books of the department. The petitioners prayed the circuit court of the District of Columbia to award a *mandamus*, directed to the postmaster-general, commanding him to enter the credit.

A peremptory *mandamus* was issued by the circuit court, which decision was brought before this court by a writ of error. All the members of this court held, that it was a proper case for *mandamus*, as the duty imposed was ministerial and positive, there being no other adequate remedy. Three only of the judges dissented, on the ground that the circuit court of the District of Columbia had not power to issue the writ; but the other six judges held, that it was not only a case for a *mandamus*, but that the circuit court had the power to issue it.

The credit was required to be entered on the books of the auditor of the post-office department, whose duties were performed under the treasury department. But as the accounts were examined in the post-office department, the credit was required to be entered by the postmaster-general on the books of the auditor. It was known that an order of the postmaster-general, requiring the credit to be entered, would be obeyed by the auditor.

In the case before us, the salary of the judge was fixed by law, and payable at the treasury department, where application for payment has been frequently made by the relator, and refused by the secretary of the treasury. It is shown that an appropriation of the salary was made by act of congress, and in such a case the payment is a ministerial act, and the secretary has no discretion to withhold it. This would not be controverted, it is supposed, if the judge, who demanded payment, had remained in office. If, in such case, the secretary may, at his discretion, refuse to pay the salaries of officers, he might suspend the action of the government. The duty to pay is enjoined on the secretary by law ; it is a ministerial duty, in which he can exercise no discretion, the appropriation having been made by law.

By the act of 2d September, 1789, the secretary of the treasury is required, to " grant all warrants for moneys to be issued from the treasury in pursuance of appropriations by law." And, in the same act, the treasurer is required to " receive and keep the moneys of the United States, and to disburse the same upon warrants drawn by the secretary of the treasury, countersigned by the comptroller, recorded by the register, and not otherwise." These are all ministerial duties, performed under the secretary of the treasury. The money having been appropriated by law for the salary of the judge, the secretary was bound to pay it.

The justification for the non-payment by the secretary is, that the relator had been removed from office by the President, and that, by the President and senate, his successor had been appointed, who, having entered upon the discharge of his duties, was entitled to the salary, and to whom it had been paid.

If the act of removal by the President was unauthorized, this can afford no justification for withholding the salary. It is admitted that, by *mandamus*, no act of an executive officer can be examined, which invades the exercise of his judgment or discretion. The payment of the salary, being a mere ministerial duty, positively enjoined by law, is subject to no such objection. But, may not the objection apply to the removal of

the judge? If such a power were within the exercise of the discretion of the President, it would be conclusive. But if the act be without authority and against law, it is void; and such was the act complained of. The President could exercise no discretion on the subject; the removal was beyond his power, and the act being void, it cannot be considered as the exercise of an executive discretion. The judgment and discretion which may not be interfered with, by *mandamus*, must be in the discharge of executive duties. These do not come within the judicial power. But an unlawful, and consequently void act, by the President, by which an injury is done to an individual, cannot be covered by executive discretion. And in this case the question is incidental to the object of the *mandamus*, which is to require the secretary to perform a ministerial duty. The removal of the judge is set up by the secretary as a reason why the relator has not been paid; and if the act of removal be void, it fails to justify the refusal to pay.

The case of Decatur *v.* Paulding, 14 Pet. 513, is altogether different from the one under consideration. In the opinion of the court in that case, the chief justice showed that it was materially distinguishable from Kendall's case.

It would be difficult to imagine a clearer case for *mandamus* than the one before us, in my judgment; and I think it should be issued. If the salary has been paid to the new judge, it has been illegally paid, and that is no reason why it should not be paid to the rightful claimant.

We have nothing to do with the conduct of the judge, nor had the President. The judge was liable to be impeached and removed from office, in that form.

### Order.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the District of Columbia, holden in and for the county of Washington, and was argued by counsel. On consideration whereof it is now here ordered and adjudged by this court that the judgment of the said circuit court in this cause be and the same is hereby affirmed, with costs.