Mr. Justice James
delivered the opinion of the Court:
The relator presents this petition for the writ of mandamus as assignee of one William Mitchell. He sets forth therein that under a contract with- the United States, made about September 3, 1886, Mitchell furnished certain material and performed certain labor for the Life Saving Service in the construction and repair of seven houses on the coast of Long Island, in the State of New York ; that the account rendered by said Mitchell therefor was adjusted on February 11, 1888, by the Treasury Department and the amount found to be due him of $12,536, as shown by the following letter from the Commissioner of Customs to said Mitchell:
Treasury Department, Oppice op the Commissioner op Customs, Washington City, D. C., Feb. IS, 1888.
Mr. William Mitchell,

Bo. State Street, Bew York City :

Sir : An account has been adjusted in your favor in the amount of $12,536, being due for furnishing the materials and labor, and making additions and alteration to seven (7) Life Saving Station houses, located on the coast of Long Island, N. Y., under contract dated September 3, 1886. Draft will be remitted.
Respectfully, yours,
John S. McCalmont,

Commissioner of Customs.

That a draft dated February 15, 1888, and numbered 11,130, for $12,536, payable to the order of said William Mitchell, was accordingly issued by the Treasury Department, but instead of being delivered to him, or the amount thereof paid to him, the draft was sent to one Captain Moore, superintendent of construction and repairs of the Life Saving Service at New York, who was instructed by the Treasury Department not to deliver it or *57 pay its amount to Mitchell until he should pay certain claims and demands presented against him at the Treasury Department by persons alleging his indebtedness to them for material and labor; that the said Moore, acting in pursuance of that instruction did not deliver the draft to Mitchell, but returned it to the Treasury Department; that it is now therein, in the charge and custody of the said Secretary; and that neither Mitchell nor the relator, his lawful assign, nor any one else acting for and in behalf of either* of them, have ever received said amount of $12,536 from the Xurited States, nor any part thereof. The relator further avers, on information and belief, that the claims and demands against Mitchell, above referred to, are unlawful and unjust, and amount to within $33 of the amount of said draft. The petition then proceeds as follows:
“Your relator further avers that the said amount of $12,536 is justly due and owing by the United States to the said Mitchell, or his lawful assign (the relator), for the work done and material furnished as aforesaid. That there is no mistake or error of any sort or kind in his accounts as adjusted as aforesaid by the accounting officers of the Treasury Department, but that the said adjustment of his said account is absolutely correct in every particular, and the amount found to be due thereby is the full sum of $12,536 ; and that the respondent does not in any way aver or set up, as a reason for not delivering saic] draft to your relator, that the said adjustment is not in every way correct; nor that the amount found to be due thereunder is not now lawfully due and payable to your relator as the lawful assignee of said Mitchell, as hereinafter set forth. And your relator, on information and belief, avers that the said Windom’s refusal to deliver said draft to your relator, or to cause the same to be delivered to him, is based upon no other ground and founded upon no other reason than that the said Mitchell and your relator have refused, and still refuse, to pay the *58 said claims and demands mentioned in the sixth paragraph of the petition.”
The relator further avers that a general appropriation was made by act of Congress to provide for the payment of work to be done in the building and repairing of life saving stations prior to the performance of the work done under the said contract of September 8, 1886, and that there is sufficient money now in the Treasury of the United States applicable to the payment of the said work so done under said contract.
In explanation of the relator’s particular position, the petition states that in certain proceedings against Mitchell in the Supreme Court of the county of New York, by judgment creditors, the relator was appointed receiver of all the property and rights of action of Mitchell, and that the latter had, in obedience to an order in that cause, executed an assignment to relator of the draft in question; that after-wards, in order to cure certain formal defects in said assignment, Mitchell had executed to relator another assignment of his claim against the United States, and of the said draft, copies of both of which are attached to the petition. It is stated that copies of these assignments had been filed in the Treasury Department before the relator demanded delivery of said drafts.
To this petition respondent demurs, assigning in the note of grounds that one of the matters to be argued upon the demurrer was that this court had not jurisdiction to compel the Secretary of the Treasury to pay out money of the United States on a demand which has not received the sanction of Congress, nor been adjudicated in a court having jurisdiction to hear and determine suits against the United States.
Both the language of this note and the argument at the bar suggest a recurrence once more to some expressions of the Supreme Court in the case of Kendall, Postmaster-General vs. The United States, ex rel. Stokes, 12 Peters, 524. Mr. Justice Thompson, speaking for the court, said :
*59 “Under the first head of inquiry, it has been considered by the counsel on the part of the Postmaster-General, that this is a proceeding against him to enforce the performance of an official duty. And the proceeding has been treated as an infringement upon the Executive Department of- the Government, which has led to a very .extended range of argument on the independence and duties of that department; but which, according to the view taken by the court of the case, is entirely misapplied. We do' not think the proceeding in this case interferes, in any respect whatever, with the rights or duties of the Executive, or that it involves any conflict of powers between the Executive and Judicial Departments of the Government. The mandamus does not seek to direct or control the Postmaster-General in the discharge of any official duty, partaking in any respect of an executive character; but to enforce the performance of a mere ministerial act, which neither ho nor the President had any authority to deny or control.”
The principle here stated has been consistently adhered to since the early case of Marburv vs. Madison, a period of eighty-seven years. That principle is that the Judicial Department of the Government cannot, by the writ of mandamus, control the Executive Department, but may constrain the individual who is charged with a duty therein to proceed with its performance, in case he neglects or refuses to act. Although the writ of mandamus is no longer a prerogative writ, and is now used as a private remedy, its original function is still kept in mind. It is a proceeding against the individual as a person in default, its object being to require him to perform an official duty imposed upon him by law. If the-duty in question involves the exercise of discretion as to how he shall act or decide, he cannot be required by this writ to do anything more than to go on with his discretionary work and to decide. Harrington vs. Hobler, 111 U. S., 796 (797); Ex parte Bradstreet, 7 Peters, 647 ; Ex parte Newman, 14 Wall., 165. To- *60 that extent the judicial power may interfere by mandamus, just as well in cases of Executive discretion as in -cases of ministerial acts. But if the officer’s next duty is to do a particular act, which no longer involves the exercise of power to examine, and of discretion as to his decision or modo of action, then the judicial power to require him to proceed with his official duties is applicable in the -form of an order requiiing him to do the particular act remaining to be performed. This, we understand, is what is meant by the rule that the courts may prescribe the very •act to be done; as, for example, the delivery of a commission (Marbury vs. Madison, 1 Cr., 137), or of a land warrant, (United States vs. Schurz, 102 U. S., 378), when the exercise of discretion has been exhausted, and only that very act remains to be performed as the next official step. In that case, the official duty that is to be enforced is not merely a duty to proceed with his work, but a duty to proceed by doing the specific act remaining to be done. But in every case the principle is adhered to, that, while the officer may, as a person, be constrained to go on with the performance of his official duties, the order of the court can never take a form which amounts to an interference with executive •government. It is just because the writ deals with persons, ¡and not with Government, that a particular act may be •directed to be done when it is merety ministerial. It is because that act, though in one sense an act of the Government — that is to say, when it is actually done — is an act which it is his individual duty to perform. In such a case, no one but himself, as an individual, is interfered with.
It remains to apply these principles to the determination of the case before us. -
The demurrer admits the following to.be the facts:
That Mitchell entered into a contract with the United States to furnish certain materials and perform certain labor for the Life Saving Service, and duly complied with that contract; that his account was adjusted, on the 11th *61 of February, 1886, by the Treasury Department, and the* Commissioner of Customs certified that the sum of $12,536-was due to Mitchell thereon; that a draft for that amount was made and sent to one Moore, an officer and agent of' the Life Saving Service, to be delivered-by him to Mitchell if he should pay, but withheld if he should not pay certain demands against him, filed at the Treasury Department;that said draft was returned by Moore to the Treasury Department, and is now there, in the oustody„ancl control oft' the respondent; that, as a matter of fact, the said amount is justly due and owing by the United States to Mitchell or-his lawful assign ; that there is no mistake or error of any kind in said account, as adjusted by the accounting officers-of the Treasury Department, but said account is correct in-every particular; that respondent does not set up, as a reason for not delivering said draft, that said adjustment is not in every way correct, nor that the amount found due-thereunder is not now lawfully due and payable to relator as the lawful assignee of Mitchell. As to the relator, it is in the same way admitted that Mitchell has duly assigned to relator his claim against the United- States, since the making of said draft, and of course since the issue of the warrant in said case.
The question is whether these facts,- thus admitted by the respondent’s demurrer, show that all- discretionary duties had been exhausted, and whether anything remained to be done by him but to deliver the draft in question, or a new draft payable directly to the relator. And first, we have to consider w'hat antecedent matters remained open as still subject to his discretion and control. For this purpose we must recur to certain statutory provisions.
Section 317 of the Revised Statutes gives to the-Commissioner of Customs the same kind of powers, as-to matters belonging to his bureau, *which is possessed by the First Comptroller of the Treasury. It is in' the following words: “The Commissioner of Customs. *62 shall examine all accounts settled by the First Auditor relating to the receipts from customs, including accounts of collectors and other officers of the customs, and certify the balances arising thereon to the Register; and shall perform all the acts and exercise all the powers relating to the receipts from customs and the accounts of collectors, and the other officers of the customs, or connected therewith, devolved by Section 269 upon the First Comptroller in regard to other receipts and other accounts.” Then, as to the effect of the Commissioner’s return in the premises, Section 191 provides as follows: “The balances which may from time to time be stated by the auditor, and certified to the heads of departments by the Commissioner of Customs, or the comptrollers of the Treasury, upon the settlement of public accounts, shall not be subject to be changed or modified by the heads of departments, but shall bo conclusive upon the Executive Branch of the Government, and be subject to revision only by Congress or the proper courts. The head of the proper department, before signing a warrant for any balance certified to him by a comptroller, may, however, submit to such comptroller any facts in his judgment affecting the correctness of such balance; but the decision of the comptroller thereon shall be final and conclusive, as hereinbefore provided.”
It is not material to inquire whether .the Secretary of the Treasury has. yet exercised his right to resubmit to the Commissioner of Customs the balance found due in this case. If he proceeded to act without doing so, that balance remained conclusive upon him. Moreover, the demurrer admits that the balance certified by the Commissioner was, in fact, correct, and that no case had arisen, therefore, for the exercise of the Secretary’s power and discretion to resubmit the account. We do not find, then, that any discretion remains to be exercised by respondent in reference to the balance found due to Mitchell. The fact of the indebtedness of the United States to Mitchell, in the sum *63 of $12,536, had been settled, then, beyond recall, when the draft in question was made out and transmitted to Moore.
If, then, the amount in question was due to Mitchell upon his contract, the next question is, whether the Secretary had any discretionary power as to paying the debt? In Decatur vs. Paulding, 14 Peters, 515, the Supreme Court, in considering the power or duty of the head of a department to revise the decision of his predecessor, pointed out that whether so to revise was itself matter of discretion; that if the Secretary had decided to revise he would next have had to exercise discretion as to allowing the claim, and that, “ after all this was done, he must have inquired into the condition of the Navy pension fund, and of the claims upon it, in order to ascertain whether there was money enough to pay all the demands upon it; and, if not money enough, how it was to be apportioned among the parties entitled.” But no such question of discretion whether to pay the debt could arise in this case on that ground. It was unlawful to make contracts without or beyond an appropriation, and it must be presumed that this contract was in that respect lawful. Besides, it is admitted by the demurrer that there was an appropriation out of which this debt could be paid.
It was next suggested at the argument that Section 191, to -which -we have referred, points out a ground of discretion to refuse payment, even after the account had been adjusted. That section provides that balances found by the Commissioner of Customs shall be subject to revision only by Congress or the proper courts; and it was said in argument : “ This right of revision necessarily implies authority of superior officers to subject such decisions to the jurisdiction of one or the other of said reviewing authorities; and to do so necessarily involves the power to refuse payment. This would necessarily imply discretion.” The answer would seem to be suggested by the argument: The discretionary power to refuse to give any effect to the accounting *64 of the Commissioner of Customs was exercised anti a decision was reached. Instead of taking steps to subject that finding to revision by the proper court, by refusing to- act upon it, the Secretary decided that it did not require revision,, because it was correct, and thereupon he proceeded to issue a warrant and have a draft prepared. lie himself brought his discretion to an end, so far as any implied right to-cause a revision by the courts was concerned. If he could determine anything by his executive discretion, he determined that question and settled the fact that there was nothing that called for revision. And again we repeat that this is admitted by the demurrer.
It would seem, then, that, so far as any questions belonging directly and immediately to the transaction between Mitchell and the United States were concerned, the respondent had acted upon every matter of discretion, and had arrived at the point where the only act to be performed was the delivery of the draft for his compensation. This is shown by the very instruction given to Moore, to deliver the draft on condition — not that his obligations to the United States-should be further or more perfectly performed, but — that he should do something exterior to his claim. This order-carried in it a declaration that so far as the- Government was concerned, everything that was to be done had in fact been done, and was in itself conclusive evidence that the remaining act, namely, the act of delivery, -was, In its nature purely ministerial. In no other condition of the case could the remaining step be committed to the .hands of a mere conduit.
But it seems to have been imagined that the respondent had some sort of discretion to annex to such delivery certain conditions relating to third parties. We had occasion,, on a former application for a writ of mandamus concerning this matter, to' intimate that the condition imposed by the respondent, requiring Mitchell to pay certain claims upon him before he could receive this- draft, seemed to be an *65 assumption of something very like the jurisdiction of a court of equity, in applying a debtor’s assets to the satisfaction of his creditors. The same point now comes before us more directly; and we are of opinion that, whatever executive discretion the respondent may have had in matters between Mitchell and the United States or the Treasury Department he had none as to matters between Mitchell and his alleged creditors. His executive jurisdiction applied to and was bounded by the case between the United States and its contractor. If, as bekueen himself ancl the (íovemment, Mitchell was entitled to a draft for the amount of his compensation — and by making and sending out the draft at all, it was determined that he had that right — then the executive jurisdiction over Mitchell’s affairs had reached its end. To all other considerations the executive was a stranger. If the time for the payment of the Government’s own debt had come, and nothing remained to be done, in order to close the transaction between the Government and it creditor, except the delivery of a draft for the money, then the official duty to close it by delivering the draft had accrued, and it was out of his power to qualify that duty by annexing conditions, to be complied with by Mitchell, which were not for the protection of the Government, but for the benefit of third parties.
We have not found in the decisions of the Supreme Court anything touching the question here presented ; but it was considered by the King’s Bench in The King vs. The Lords’ Commissioners of the Treasury, 4th Adol. & Ellis, 286, 31 Eng. Com. L. Rep., 139. In that case the Lords of the Treasury had submitted a vote to Parliament for granting a retired allowance to a public officer, on certificate of ill-health, according to the Statute 3 George IV, Ch. 113. The vote passed, but the pension was not specifically mentioned in the appropriation act, which, however, directed a gross sum to be applied in discharge of retired allowances. The *66 Lords of the Treasury, on application by the party for payment, informed him that he might receive it from a Treasury officer whom they named. The officer declined paying, inasmuch as he had no authority from the Lords of the Treasury, and they, being again applied to, refused to give such authority, except on condition that the party would forego certain legal proceedings, which he refused to do. It was held that the party had a legal right to the allowance, the Lords of the Treasury having admitted that the money for paying the allowance was in their hands. Lord Denman, C. J., said that the money was in the hands' of the respondents for payment to the party, and they had no right to' annex conditions to the payment. This rule was approved by the King’s Bench in the subsequent case of the King vs. the Lords’ Commissioners. In re. Hand, 4 Adol. & Ellis, 984.
As to an implied or inherent executive discretion to annex to the performance of a ministerial act the particular kind of condition which was imposed in this case, one more consideration may he added. The respondent had no means of investigating and determining the validity or justice of the claims filed against Mitchell. For aught that he could possibly know they might be wholly or in part fraudulent, or they might be open to counter claims or set-offs between the parties. In contemplation of law he knows absolutely nothing about the claims whose pajnnent he insists upon, and it is impossible to suppose that he has a discretion to decide in the dark. We have suggested that this condition seems to be an assumption of jurisdiction in equity; but even a court of equity would decline to enforce claims of creditors without a previous establishment of their validity by judicial inquiry and judgment.
In connection with this part of the case, it is proper to state that we do not decide that there are no circumstances in which the Secretary of the Treasury can have a discretion to refuse payment even when the proceedings have *67 reached the stage shown in this case. If such grounds of •discretion exist, they may yet be shown in the return. On this point we may refer to an observation of Lord Denman in Ilex vs. The Lords’ Commisssioners, supra: “If, as has been suggested,” said his lordship, “it should on any occasion be unsafe, with reference to the public service, to make a payment of this kind, the fact may be stated on return to the mandamus.” 4 Adol. & Ellis, 295.
Finally, it was urged at the argument that' the delivery •of this draft, or of one payable directly to the relator as assignee, cannot be enforced by the writ of mandamus, because such a proceeding is substantially a suit against the United States, having for its object the withdrawal of money from the Treasury of the United States.. On this point the cases of Reeside vs. Walker, 11 How., 272, and United States vs. Guthrie, 17 How., 284 (303-4) were cited. The respondent’s citation is from the opinion delivered by Mr. .Justice Daniel in the latter case, speaking for himself and three other justices. Mr. Justice Curtis, speaking for himself and three other justices, placed their concurrence upon wholly different grounds, while Mr. Justice McLean dissented; so that the passage cited was' from a minority opinion. - We cannot doubt, however, that the court would have concurred in the opinion expressed by Mr. Justice Daniel, that no court could command the withdrawal of» a sum of money from the Treasury, in the absence of an appropriation by Congress, to be applied to the satisfaction of a disputed or controverted claim against the United States. We suppose this proposition to be unquestionable, but do not perceive that the case before us falls within it, nor do we perceive that this proceeding contains the essential elements of a suit against the United States. The office of such a suit would be to ascertain ancl establish a right against the United States, which the United States had not before conceded. In this case it appears that the United States have authorized competent authority to *68 adjudicate and establish the right to compensation; that it has been in fact so adjudicated and established; that an appropriation out of the Treasury of moneys for the payment of such claims has been made; that respondent has been, authorized to apply such specific share of these moneys as he should find necessary for each of such claims as he-should adjudicate it; that this is equivalent in law to a specific appropriation of that sum for that purpose; that nothing remains but to make the payment, which respondent is authorized by law to make, in settlement of the-adjudicated claim; and that the execution of this final, and 'ministerial step is prevented by the officer’s refusal to-act-. In such a case, the object of the proceeding is not to constrain the United States to admit and satisfy a right, but to enforce against an individual a command of the United States to satisfy a claim which the United States has, through his own action, already recognized and established. We repeat that we perceive in such a proceeding no adversary relation between the relator and the United States, such as is involved in a suit against the United States. The result in no way alters or affects the position already held by the United States ; it affects only the person who stands in the way and prevents the will of the United States.
Upon the case, as it stands on the demurrer, our conclusion is, that, when the draft in question was made out, the executive discretion of respondent had been already exercised and exhausted ; that the duty of delivery had accrued, and that that duty was purely ministerial, and not subject to conditions which did not enure to the protection and benefit of the United States.

The demurrer is accordingly overruled, and respondent is ruled to make return-.

The demurrer, being thus overruled, the respondent made return, the substance of which is set forth in the following opinion of the Court (delivered July 23, 1890), the case being heard upon the pleadings—
*69 Mr. Justice James
delivered the opinion of the Court:.
When this case was heard here on demurrer to the petition we held that the relator had shown prima facie that the sum of $12,536 was due to him for work done and material furnished in repairing and building certain life-saving stations; that his accounts had been settled by the accounting officers of the Treasury, and were- now admitted by respondent to be correct, and that a draft for the amount found due had been made out, but was withheld until the relator should pay certain claims of the subcontractors and workmen who had assisted in those repairs and constructions. While we held that the case stated by the relator showed that the grounds on which payment was'withheld were insufficient, and that nothing seemed to remain but the performance of a ministerial duty by the respondent, we were careful to reserve any question which might be presented by a return. The court said : “ It is proper to state that we do not decide that there are no circumstances in which the Secretary of the Treasury can have a discretion to refuse payment, even when the proceedings have reached the stage shown in this case. If such grounds of •discretion exist they may yet be shown in the return.”
On this point we may refer to the observation of Lord Denman in Rex vs. The Lords’ Commissioners of the Treasury :
. “ If, as has been suggested,” said his lordship, “ it should on ‘ ■any occasion be unsafe, with reference to the public service, to make a payment .of this kind the fact may be stated in ■the return to the mandamus. 4 Ad. & E., 295.
A return has now been made. ' It states in effect that the ■contractor was liable by his contract to a penalty of $30 per ■day for any default in completing the work within the time ■■stipulated; that he has actually incurred penalties for delays 'to the amount of $6,240, and that the enforcement of these ■penalties, by deducting them from the amount of his •account, was only waived conditionally — that is to say, on *70 the condition that the relator should allow the disbursing-officer, to whom the draft was sent, to pay the subcontractors and workmen out of the proceeds of the draft. It is claimed in the return that the conditions of the proposed waiver were not complied with by the relator, and that there has been no absolute waiver.
On this point the respondent says:
“ In the opinion of the respondent said forfeitures and penalties may legally be insisted upon by the Government and the amount thereof deducted from said draft, and it is. a legal right of the respondent, in his opinion, to secure a restatement of said account or to cancel said draft or to take such other course to secure said penalties and forfeitures to-the Government as the laws and the regulations of the Treasury Department may require, and he avers that to-leave the relator to his remedy at law would, in respondent’s opinion, enable the Government to avail itself of the said forfeitures or other just damages in the premises.”
AVe think that this return is conclusive of our action in. the case. It alleges that there has never been an absolute waiver of the penalties incurred by relator’s assignor, and that respondent is now charged with the executive duty of enforcing and has the purpose to enforce these penalties,, and that it is his executive duty not to pay the amount found to be due only on condition that such penalties should be waived.
Whether there has been an actual waiver and loss of' these penalties is a mixed question of law - and fact which cannot even be considered in a proceeding by mandamus.. It is a familiar principle which this court has had occasion repeatedly to state, that this writ is applied only to enforce a plain legal dutjq and questions of fact are not ligitated for the purpose of establishing the existence of a legal duty.
When the head of an executive department informs us, in answer to a rule to show cause, that he withholds the *71 final act of delivering the draft, which was prepared for delivery upon conditions, and that he does so in order to enforce and deduct penalties which had not been waived, we cannot in this proceeding try the disputed question whether, by reason of the circumstances, there remains any further executive duty to be performed by him in the premises.
But especially we must consider that it now appears that there is not a clear legal claim, and such a claim and a plain legal duty must unite in order to justify interference by mandamus.

Rule discharged and ivrit denied.