[No. 1185, February 25, 1907.]

TERRITORY OF NEW MEXICO, ex rel, T. S. HUB-
BELL, Appellant, v. PERFECTO ARMIJO, Appellee.

SYLLABUS (BY THE COURT).

1.   A term of a District Court in this Territory, begun and held by any judge, as required by law, for a county in the district, continues in existence until the day fixed by law for the beginning of another term of that court for the same county, unless sooner adjourned without day, although another term of the same court for another county has been held, as required by law, in the meantime, by the same judge.

2.   Anything done by a judge of a District Court in a proceeding by information in the nature of quo warranto, so far, at least, as it is treated as a civil cause, which would be valid if done in term time. is not invalid because done outside of a regular term of such court.

3.   The executive power vested in the Governor of New Mexico by the Organic Act does not include the right to remove an officer elected in accordance with a statute law of the Territory.

Appeal from District Court for Bernalillo county, before IRA A. ABBOTT, Associate Justice (Judgment pro forma.) Reversed.

W. B. CHILDERS, A. B. McMILLEN, E. W. DOBSON, with them on the briefs by virtue of his office, W. C. REID, Attorney General, for Appellant.

The Governor has not the right to remove an officer under the provisions of the Organic Act, section 3, (Section 1841 R. S. U. S.) ; Compiled Laws, 1897, secs. 844 to 857, inclusive; Commonwealth v. Shafer, 64 Am. Dec.

680; State v. Chatburn, 63 Iowa, 659, 50 Am. Rep. 761-762; People v. Therion, 45 N. W. 78-79; State ex rel Atty. Gen. v. McCain, 58 Ohio St. 331, 50 N. E. 907; Territory v. Ashenfelter, 4 N. M. 134; Field v. People, 3 Ills. 91; Dallam v. Wilson, 53 Mich. 392, 51 Am. Rep. 128; Police Com. v. Pritchard, 36 N. J. L. 114; Page v. Hardin, 8 B. Munroe 648-675; 3 Story on Const. 1538; Evarts Speech in the Impeachment Trial 313, 318; Mechem on Public Offices, secs 440, 445, 446, 447, 448, 450, 452; Ex parte Hennen, 13 Pet. 259; Parsons v. U. S., 167 U. S. 328, and pages 335 and 336 quoting from Marbury v. Madison, 1 Cranch 147.

The Governor clearly has no jurisdiction to hear and determine charges against the sheriff under section 2567, Compiled Laws of 1897. Even if authorized by statute to remove the sheriff, he cannot remove him for any act committed during a prior term of office. Cummings v. Missouri, 4 Wall. 277, 320, 323, 326, 328, 331; Ex parte Garland, 4 Wall 333; Ex parte Mulligan, 4 Wall. 73, 118 and 119; 5th, 14th and 7th amendment of the Constitution; Parsons v. Bedford, 3 Peters 446; State ex rel Police Commissioners v. Pritchard, 36 N. J. Law 106-107; 23 A. & E. Enc. of Law 445 (2nd. Ed.); Speed v. Detroit, 57 N. W. 407, 22 L. R. A. 842; Guden v. Dike, 75 N. Y. Sup. 787; Thurston v. Clark, 40 Pac. 436; Compiled Laws of 1897, secs. 844 to 856; Hayburn's Case, 2 Dallas 407; U. S. v. Ferrerira, 13 How. 52, Co-op. Ed. 47.

"It is the right and duty of the courts to examine the constitutional validity of every statute brought fairly before them as applicable to a pending controversy." Black's Constitutional Law, page 51; Cooley's Constitutional Limitations, 5 Ed., side paging 160; Marbury v. Madison, 1 Roses Notes, page 156; Dodge v. Woolsey, 18 How. 347-348, Co-op. ed. 407; Norton v. Shelby county, 118 U. S. 442; Osborne v. The Bank, 9 Wheat. 866; Dullam v. Wilson, 53 Mich. 392, 51 Am. Rep. 128; Page v. Hardin, 8 B. Munroe, 648-675; U. S. v. Walker, 109 U. S. 27; Cornett v. Williams, 20 Wall. 26.

The governor cannot be invested with the power of

removal from office upon charges. Spencer v. County of Sully, 33 N. W. 98; Board of Commissioners v. N. P. R. R. Co., 10 Mont. 420; Ellison v. State, 125 Ind. 496; Foster v. Kansas, 112 U. S. 206; Kennard v. Louisiana, 92 U. S. 480; Taylor v. Beckham, 178 U. S. 548; Wilson v. North Carolina, 169 U. S. 586; Sinking Fund Cases, 99 U. S. 761; Rhode Island v. Mass., 12 Peters 718; Carter v. Durango, 16 Colo. 536; State v. Wallridge, 119 Mo. 390, 24 S. W. 460; Kilburn v. Law (111 Calif.), 43 Pac. 615; Hart v. Duluth (Minn.) 55 N. W. 118; Cooley's Const. Lim. 110; Board of Aldermen v. Darrow, 13 Colo. 460, 16 Am. St. Rep. 216; People v. Stewart (74 Mich.), 16 Am. St. Rep. 646; Perry v. Kings County, 2 Wash. Rep. 341; Page v. Hardin, 8 B. Munroe 672; Arkle v. Board of Commissioners (W. Va.) 23 S. E. 804; Mechem on Public Officers, sec. 455; Dullam v. Wilson, 53 Mich. 392, 51 Am. Rep. 128; Police Commissioners v. Pritchard, 36 N. J. L. 114; Hayburn's Case, 2 Dall. 407; U. S. v Ferrerira, 13 How. 52, Co-op. ed. 47.

NEILL B. FIELD, for Appellees.

The statute and practice in New Mexico clearly provide that upon the overruling of a demurrer, the party demurring shall have opportunity to plead over. Compiled Laws of 1897, section 2685, sub-sections 36 and 81.

A common law court is without power to exercise its functions as a court during vacation. Compiled Laws, 1884, section 1829; Territory v. Ashenfelter, 4 N. M. 148; Staab v. Atl. & Pac. Ry. Co., 3 N. M. 611; Wicks v. Ludwig, 9 Cal. 175; Norwood v. Kenfield, 34 Calif. 333; Grable v. The State, 2 Iowa, 568; Bronson v. Schulten, 104 U. S. 415; 21 Enc. Plg. & Prac. 599; Dunn v. State, 35 Amer. Dec. 65; Albright v. Terr. ex rel Sandoval, 200 U. S. 9, 79 Pac. 719; Hendry v. Mining Co., 85 Pac. 1043; Ganton v. Angle, 11 Fed. Cases 116; Taylor on Jurisdiction 636, 637.

The power to remove incompetent and corrupt officers is embraced within the grant of executive power contained in the Organic Act. Insular Cases, pages 305-306; 4th Elliott's Debates, pages 355, 356, 379, 380; Parson's v.

U. S. (167 U. S. 328, 330) ; 1st Lloyd's Cong. Rep. pp.
350, 351; National Bank v. County of Yankton, 101 U.
S. 129, 132, 133; Murphy v. Ramsey, 114 U. S. 44-45;
American Insurance Co. v. Canter, 1 Peters 542; Organic
Act, section 8; McPherson v. Blacker, 146 U. S. 25, 26,
127; in re. Neagle, 135 U. S. 63, 64; 2 Tucker on the
Constitution. p. 748; Stuart v. Laird, 1 Cranch 299, 309;
Reid v. Gorsuch, 67 N. J. L. 401, 402; 4th Elliott's De-
bates, pages 136, 495; Dred Scott v. Sanford, 19 Howard
513, 620; Territory v. Ashenfelter, 4 N. M. 132, 135, 137;.
15 Statutes at Large 239; McAllister v. U. S., 141 U. S.
174; in re Cooper, 143 U. S. 472; Field v. The People,.
3 Ill. 91; Clinton v. Engelbrecht, 13 Wall. 441.

## STATEMENT OF FACTS

The relator, Thomas S. Hubbell, held the office of
sheriff of Bernalillo county, New Mexico, by election, in
November, 1904, when he was re-elected to that office for
the term of two years, beginning January 1, 1905. He
duly qualified for office and served as sheriff in the term
for which he was thus elected, without question as to his
right so to do, until August 31, 1905. Prior to that time,
in the year 1905, specific charges against him of miscon-
duct in office, had been filed by the District Attorney for
said county, with the governor of the Territory. A hear-
ing on the charges had been given and on August 31, 1905,.
the governor made an order reciting the charges, the hear-
ing, stating that certain specified charges had been proved,
that he could not perform the duty imposed on him to see-
that the laws were faithfully executed, with the relator in
office, and that he did thereby remove him from the office
of sheriff of Bernalillo county. On the same day, August
31, 1905, he made an order, reciting that a vacancy existed
in the office of sheriff of Bernalillo county, but without
stating the cause of such vacancy, and appointing Perfecto
Armijo, the defendant, to the office. Before resorting to
the course now taken to establish the rights he claims, the
relator had attempted to retain or regain the office in
question by mandamus, and equity proceedings, but this
court held, as it had done in former cases, that an in--

formation in the nature of quo warranto was the appropriate and only method open to him, under the circumstances, to try his title to the office. The cause is now before this court on appeal from a judgment of the District Court for Bernalillo County based on a *pro forma* order, made for the convenience of parties, to facilitate a hearing in this court, sustaining the defendant's demurrer to the information and dismissing the case. The order was made by' Associate Justice Abbott, judge of the Second District, and as it was made *pro forma* left him qualified to sit as he did, for the hearing of the cause, as a member of this court. The defendant in his demurrer preserved the right to challenge the jurisdiction of the District Court and exercised it here on grounds stated in the opinion.

### OPINION OF THE COURT.

ABBOTT, J.—Dealing first with the question of jurisdiction, we find the defendant's denial of it is based on two grounds: First, that at the time when action was taken in the cause there was no term of the Second District Court for Bernalillo county in existence, for the reason that a term of said court as fixed by law, for Sandoval county had begun after the beginning of the next preceding term for Bernalillo county and before such action taken; and, second, that an information in the nature of quo warranto is a criminal proceeding and the court could take no action on it except during a term. That is, it is claimed, in substance, as to the first point, that two terms of the same court for different counties, the same judge being an integral part of the court in each case, are incompatible with each other and that the beginning of a term at the time prescribed by law in one county necessarily makes an end of a term for another county in the same district at that time in progress. It is true, of course, that, ordinarily at least, the presence of the judge is essential to the validity of any act of the court of which he is a part; but the court survives the absence, removal, or death of the judge, and in case of his disqualification for any particular act, another judge may generally perform it in his place. Besides, a term of court is not the same thing as the court itself, and is no more than

a period of time within which, and then only, certain functions of this court can be exercised. The beginning of this period is fixed by law in the territory for each county. Its end comes only by adjournment, or by the arrival of the date designated by law for the beginning of another term of the same court for the same county. Sec. 909, Compiled Laws of 1897; People v. Central City Bank, 53 Barb. 416; Labadie v. Dean, 47 Texas 100. This court has already held, in substance, in Borrego v. Territory of New Mexico, 8 N. M. 446, that merely constructive interference of one term with another does not terminate the existence of either or render anything done in it by the court invalid. That decision was upheld in Gonzales v. Cunningham, 164 U. S. 612. In Territory v. Netherlin, reported in 85 Pacific Reporter 1044, a motion for a rehearing in this court, based in part on the claim that one term of court had destroyed another, was denied. No good reason is perceived against holding any number of terms for different counties in the same district on the same day if the public convenience should require it. To hold otherwise would be to assume that by mere words we had laid hold on time itself and cut it up into portions capable, like solid bodies, of jostling and colliding with each other; an assumption which might have been quite in keeping with the technicalities of an early period in the history of English jurisprudence but would now be out of place. But assuming that an examination of the records of the Second District Court would show that action was taken in the case at bar on one or more occasions after the adjournment without day of a term of that court for Bernalillo county and before the beginning of another term, we arrive at the second point in the defendant's objection to the jurisdiction, namely, that this is a criminal or *quasi* criminal cause and that no valid action could be taken in it out of term.

The term of court is now preserved in this jurisdiction mainly, if not wholly, for jury trials and matters incidental to or connected with them and except for such purposes the District Courts are declared to be always

Territory v. P. Armijo.

open. Sub-secs. 103-4 of Sec. 2685, Compiled Laws of 1897. There is nothing in the essential nature of quo warranto proceedings to furnish a reason why they should not be had in vacation. On the contrary they are peculiarly such as are most advantageously conducted by the courts in chambers, and, while it was recited in Territory v. Ashenfelter, 4 N. M. 134, cited by the defendant, that the proceedings referred to were in term and were regular and valid it was not said they would not have been equally valid in vacation, and indeed, the opinion on that point, we think, strongly favors the opposite conclusion. The proceeding by information was never more than incidentally criminal, its main purpose having been in its early history and its only one in recent times being to try title to office. Whether, if a fine had been imposed, it would have put the cause on the criminal side, so far as to render that action of the court invalid if not taken in term, we need not now decide, as such action was not attempted; but it should be noticed in this connection that this court in re Sloan, 5 N. M. 614, held, that an order of attachment for contempt by which a fine was imposed was valid although made out of term. See High on Ex. Legal Rem., Secs. 737, 741; 23 Am. and Eng. Enc. of Law. 599; Ames v. Kansas, 111 U. S, 460.

We are of the opinion, therefore, that the objections to the jurisdiction are not well taken.

We come now to the question whether the governor of the Territory had the power to remove the relator from office as he attempted and assumed to do.

As the court well says in Territory v. Ashenfelter, supra, "It is a very delicate task for one department of the government to pass upon the acts of either of the others. It is, however, unavoidable, as the law has imposed upon the judiciary duties it cannot and should not seek to escape, but rather to discharge them with the highest regard for the other departments, and with the single purpose to maintain only those principles of law firmly established by the weight of authority and well founded in justice." It is fortunate and gratifying that our way to a conclus-

ion on the highly important question before us has been well lighted from both sides by the able counsel who appeared in the cause, and especially that the full strength of the position against which we decide has, we believe, been presented in the interesting and comprehensive brief and argument for the defendant, so that, if we are in error, it is not from lack of any material which might have conduced to the opposite result. The issues were limited by the admission in the brief for the relator, if the attempted removal by the governor was valid he had the power to fill the vacancy thus created, and by the concession in the brief for the defendant, that unless the power of removal was conferred by Section 3 of the Act of Sept. 30, 1850, establishing a territorial form of government for New Mexico, commonly known here as the Organic Act, it does not, for the purposes of this case, exist.

We have not, therefore, considered and do not decide whether the governor had the right to remove the relator on the charges made against him under the statute law of the Territory.

We might properly, perhaps, apply the doctrine of *stare decisis* in this case on the authority of Territory v. Ashenfelter, supra. The case of Field v. The People, 3 Ill. 79, was given great weight by the court in the Ashenfelter case, to which it was well entitled by virtue of the high standing of the judge who rendered the decision. But it is urged, with much force, that the governor of a state stands in widely different relations to its people, even when the same language is used to prescribe them, from those held by the governor of a Territory of the United States toward its people. But while the reasoning of the court as to the true nature of the provision in the Organic Act under consideration seems to us to be sound and unassailable, the conclusion reached in the Ashenfelter case, as well as in Field v. The People, went so far as to cover the case of an officer appointed by the governor, a conclusion which, in view of later decisions, we are unwilling to adopt, unless after full consideration in a cause definitely involving that point. We therefore treat the question now raised as one open for consideration on its merits.

The defendant's contention rests on three propositions, which stated in logical sequence are: That the President of the United States has the power of removal from office: That he has that power by virtue of Sections 1 and 3 of Article 2 of the Constitution of the United States: 3 That the grant of executive power to the governor in Section 3 of the Organic Act, (Sec. 1841, U. S. Rev. Stat.,) is practically identical in language and meaning with the related portions of the above named sections of the Constitution. From these main premises, as they are explained and supported by other portions of the Constitution and the Organic Act, it follows, he claims, as a necessary conclusion, that the power of the governor in his sphere of duty is the same as the President's in his. The portions of Section 3 of the Organic Act, on which the defendant especially relies are as follows: "That the executive power and authority in and over said Territory of New Mexico shall be vested in a governor; x x x he shall commission all officers who shall be appointed to office under the laws of the said territory, and shall take care that the laws be faithfully executed." This is practically a paraphrase of the corresponding provisions of the Constitution from which it was presumably adopted. We feel bound to follow the question whither it leads although that be into the domain of constitutional law, which is the peculiar province of the Supreme Court of the United States. The claim that the President has the power of removal so accords with the common understanding and observation that it would not seem to require examination, but, singularly enough we are well on in the second century of the Constitution and of the Supreme Court without a decision by that august tribunal that the President has or has not the power to remove from office, as a Constitutional right. "It is a striking fact that a power so transcendent as that is should depend upon inference merely and has never received judicial discussion." Kent's Com., Vol. 1, p. 310, 12 ed. Since the time of that statement there has been a thorough historical discussion of the subject in Parsons v. United States, 167 U. S. 324 (1896), cited by the defendant, but the examination concludes thus: "The

foregoing references to debates and opinions have not been made for the purpose of assisting us in ourselves arriving at a decision of the question of the constitutional power of the President in his discretion to remove officials during the terms for which they were appointed and notwithstanding the existence of a statute prohibiting such removal, but simply for the purpose of seeing what the views of the various departments of government have been upon the subject of the power of the President to remove and what claims were made and how much of acquiescence had been given to the proposition that to the President belonged the exclusive power of removal in all cases other than by way of impeachment. It is unnecessary for us in this case to determine the important question of constitutional power above stated." In United States v. Guthrie, 17 How. 284, examined in the same opinion, the majority of the court held that the question of constitutional power was not involved, but Justice McLean, delivered a dissenting opinion in which he maintained that the question of the power of the President to remove was before the court and that is was not by the Constitution committed solely to the President. We think it necessary therefore, since the defendant relies so largely on the alleged correspondence of the governor's power of removal to that of the President, to make some search for the foundation on which the latter rests and then inquire whether that of the governor has the same or a like basis.

That the framers of the Constitution meant by the sections in question, or indeed, by anything in the instrument, to vest in the executive the sole power of removal from office at his discretion is incredible, in view of what we know of the history of their work and the temper of the times. At the present day, when, according to a distinguished writer, Bryce, Am. Com., Vol. 1, p. 290, 3 ed., the pendulum of popular confidence has swung well away from the nominal representatives of the people in the various legislative bodies, and toward the chosen executives, the presidents, governors and mayors, it is hard to imagine how profound was the opposite feeling at the time when the Constitution was made ready to receive the

popular verdict. "Fear of executive usurpation was strong", says Thorpe in his History of the Constitution. "Distrust of executive power was characteristic of the time". Id., Vol. 1, pp. 327, 448. The colonies had carried on the war for independence to a successful issue without executive head of the alliance, and opposition to having any executive whatever in the proposed new scheme of government found considerable support in the convention which framed the Constitution. Some members advocated the selection of the executive by Congress. Some favored a plurality of executives as better calculated to avoid that despotism which they feared would become centered in one. The casting vote of Washington was needed to make a majority in the Virginia delegation against that plan, and New York went on record in favor of it in spite of the fact that Hamilton was a delegate and one of the leading advocates of a strong executive. When it was finally decided to provide for a single executive the contest went on in relation to the powers he should have, with the preponderance of opinion strongly in favor of keeping them within narrow limits. The power of removal was not mentioned in the Constitution and it seems not to have occurred to any one that it lurked in the clause conferring the executive power or that imposing on the President the duty of seeing to the faithful execution of the laws. Sections 1 and 3, Art. 2. But the power of appointment, although dependent on the consent of the Senate, Sec. 2, Art. 2, was thought to have in it an element of the danger of executive usurpation and was attacked accordingly. Its opponents were, however, assured that the President could not create vacancies by removal against the will of the Senate, and that, therefore, the power to nominate and conjointly with the Senate, to appoint, would be innocuous. After the proposed Constitution had been submitted to the States for action, Hamilton apparently though it well to further assure the people on that point, and in the Federalist, No. 77, said: "The consent of that body",—the Senate—"would be necessary to displace as well as to appoint."

Can it be doubted what would have been the fate of

a clause proposed to that convention as a part of the constitution, or of a constitution containing it, offered for acceptance to the states, reading: "The executive power shall be vested in a president x x x who shall take care that the laws be faithfully executed, and to that end shall have power at his discretion, to remove all officers of the United States"? Nevertheless it transpired that at the first session of Congress in 1789, as the defendant points out, practically that interpretation was contended for by Mr. Madison, and the power of removal as belonging solely to the President was recognized by Congress and continued to be so recognized in practice until the passage of the Tenure of Office Acts, in 1867. C. 154, 14 Stat. 430; C. 170, id. 485, 486. They, in effect, made the assent of the Senate essential to the removal of any officer to whose appointment its consent was requisite, and contained other provisions designed to limit the powers of the President. To some extent they continued to be operative, in spite of repeated efforts to repeal them, as a curtailment of the power of removal until 1887, since when the earlier practice, restored by Act of Congress, 24 Stat. 500, as construed in Parsons v. The United States, supra, has prevailed. That the construction thus adopted by the first Congress was due, not so much to the weight of the arguments of Madison and others who agreed with him as to the universal confidence in Washington, then President, and to his well known views on the subject, may easily be believed. Story, Const., Vol. 2, Sec. 1543. That it was a perversion of the true intent and meaning of the Constitution, eminent writers on the subject have more than hinted. Story, Const., Secs. 1537-44; 1 Kent's Com. p. 310.

The effect of the action of the first Congress has been so far weakened by the passage of the Tenure of Office Acts of 1867, and the practice of the government in accordance with them, until Congress saw fit to repeal them, that it cannot be said the President's power of removal is unquestioned. It appears, rather, to be exercised with the acquiescence of Congress and to be recognized as practically necessary to the conduct of a government in operation over so vast a field as that covered by ours.

But it may perhaps fairly be claimed that although there has been no declaration by the Supreme Court, that the President has the constitutional power in question, there have been strong intimations that it would so hold if the occasion for a decision should arise. Thus, in Parsons v. The United States, supra, the care taken by the court to avoid approval of the constitutionality of the Tenure of Office Acts, amounts almost to disapproval. But utterances on which that claim must needs be based, and nearly all others of high authority on the subject, plainly indicate we think that such a decision, if made, would not rest, unless indirectly, on the clause of the Constitution relating to the executive power, *eo nomine,* or to that of imposing the duty of commissioning officers and seeing to the faithful execution of the laws, but on the one dealing with appointments to office. Sec. 2, Art. 2, Const. It is true, that some expressions of Mr. Madison on the subject in his argument in the first Congress, attributed to sections 1 and 3, of article 2, a broader scope and significance than we here accord to them, but, great as the weight properly attaching to his authority is, he was human, and could not have been wholly free from the bias of the advocate on that occasion, when he was urging the passage of a measure he had introduced. Yet, even under such circumstances he used this language: "The doctrine, however, which seems to stand most in opposition to the principle I contend for is, that the power to annul an appointment is in the nature of things, incidental to the power which makes the appointment. I agree that if nothing more was said in the Constitution that the President by and with the advice and consent of the Senate, should appoint to office, there would be a great force in saying that the power of removal resulted by a natural implication from the power of appointing." In United States v. Guthrie, supra, (1854) Attorney General Cushing adopted the argument which Mr. Madison had originally made, but he connected it more directly than Mr. Madison had done with the appointing power. "The construction adopted by the first Congress and approved by Washington", said he, "resolved these points". x x x "3. That the power of removal from office

is incident to the power of appointment". x x x "6. That
the duty imposed on the President to take care that the
laws be faithfully executed, absolutely requires that he
should have the power of removing unfit, negligent and dis-
obedient officers". Taking the two "resolved points" to-
gether it does not clearly appear he meant any more
than that the President alone rather than he and the
Senate conjointly had the power of removal. Replying,
Mr. Lawrence said, referring to the debate in the first
Congress it "had reference to a purely executive office
and much of it was spent on the question whether if the
power of removal was incident to the power of appoint-
ment the President and Senate, and not the President
alone, should remove. And the main argument for the
President's power was his responsibility for the acts of
purely executive officers, who were his agents". Continu-
ing Mr. Lawrence said, "What is executive power with ref-
erence to the government of the United States? It is
not executive power in the abstract; x x x it is such execu-
tive power as arises out of the Constitution and laws of
the United States. It is exactly the power in any given
case of carrying the particular law as it stands into exe-
cution". As we have seen the case was held not to turn on
the question thus debated by these eminent lawyers. The
two arguments, that of Mr. Madison and that of Attor-
ney General Cushing, each made under circumstances
which imposed no responsibility on the advocate to present
the opposite view of the question, are the strongest state-
ments of the contention made by the defendant, of which
we are aware. In each case it was urged that the power
of removal was necessary to executive efficiency and the
suggestion is conveyed that the sections in question, 1 and
3 of Article 2, vesting executive power in the President
and imposing the duty to see that the laws were faithful-
ly executed, would have little force or value unless they
conferred the power of removal. But our Presidents, Mr.
Madison himself, no doubt, as one, have demonstrated the
vitality and usefulness of those provisions by calling the
attention of Congress to the need of further legislation to
facilitate the enforcement of existing laws, by putting in

motion the machinery of prosecution against offenders, by affording protection to the courts of the United States as related in the Noagle case, 135 U. S. 63, 64, cited by the defendant, and by using the military and naval forces of the Nation to secure obedience to law.

If, in the absence of judicial decision, we turn to other opinions expressed on the subject by men whose views are generally held to be of commanding weight, we find that Mr. Clay said, referring to the clause imposing the duty to see that the laws shall be faithfully executed: "That clause means nothing more and nothing less than this, that if resistance is made to the laws he shall take care and resistance shall cease." Von Holst Con. Hist. of U. S., Vol. 2, p. 63: "This executive duty extends to the carrying out of the laws of the United States to the extent of the several means placed in his hands." Tucker on the Constitution, sec. 362. "If it were really the duty of the President to enforce the execution of the laws by all the means at his disposal in the sense in which he understood them, the republic was turned over, bound hand and foot, to one man". Von Holst, Vol. 2, p. 63. Attorney General Clifford, afterwards long a Justice of the Supreme Court, said in an opinion rendered in 1847, referring to the debate in the first Congress: "The doubt which arose was whether the concurrence of the Senate was not requisite to affect a removal in all cases where it is required to consummate the appointment. The power was finally affirmed to be in the President alone". See Mechem on Public Officers, Secs. 440 to 450; Marbury v. Madison, 1 Cranch. 147; Ex Parte Hennen, 13 Peters 259.

We have been at pains to show that, as we think, sections 1 and 3 of Article 2 of the Constitution, do not in themselves confer any specific power on the President but have only served as a makeweight to give him the sole power of removal under Section 2, Article 2, for the reason that the Organic Act does not confer on the governor the power of appointing officers of the class to which the relator belonged and his authority therefore lacks one of the two supports which the power of the President has,

and that in our view the principal one, the one to which the other, as regards removals from office, is only auxiliary.

Section 8 of the Organic Act declares that "all township, district and county officers not herein otherwise provided for shall be appointed or elected as the case may be in such manner as shall be provided by the governor and legislative assembly of the Territory of New Mexico." They might have provided that sheriffs should be appointed by the governor, and we shall see, he might have insisted on that since he was a part originally of the law making power of the territory with the right of absolute veto, in which case the question of the power of removal would have been quite different, we apprehend, from that now presented. But in fact, they did provide that sheriffs and other county officers should be elected by the voters of the several counties, and in this manner: It was provided in the Kearny Code, Sec. 1, Title, Sheriffs, that the governor should appoint "some suitable person as sheriff in every county". Five years later, in July, 1851, the first legislative assembly under the Organic Act, enacted a law for the election of sheriffs, and so far as appears that law, with some minor amendments, has been in force ever since. In making it, the governor presumably joined, and it is of the greater force, in this connection, from the voluntary surrender of the power exercised by former governors, and very likely by himself, which he must thus have made.

It is however, claimed by the defendant that the words "elected" and "appointed" have the same meaning in this instance and that when the people of the territory were authorized by the governor and assembly to "elect" certain officers they were merely empowered, in effect, to act in so doing as their agents, possessing only a revocable authority and incapable of binding their principals, who retained the right, to be exercised through the governor, as the executive, of removing at his discretion, all officers whom the people should thus choose. The argument is highly ingenious and not without force. It is true that the words "appoint" and "elect" are to some extent used interchangeably. In McPherson v. Blacker, 146 U. S. 25-6, cited

by the defendant, it was held that a state might provide
for the choice of presidential electors by popular vote, al-
though the word used in the Constitution in relation to the
subject is "appoint". But that, we think, is very far from
sustaining the claim that where both words are used to-
gether as in Section 8 of the Organic Act, they were used
with the same meaning and not to distinguish one method
of selection from the other, and to permit the existence of
two classes of officers, one elective and the other appoint-
ive, in the usual sense of those words, in case the gov-
ernor and legislative assembly should see fit so to provide.
Whether the provision in Section 3 of the Organic Act that,
"the governor shall commission all officers who shall be
appointed to office under the laws of the said Territory",
applies to officers elected under Section 8, we do not think
it important to determine in this connection since the
power, or as it might perhaps more fitly be termed, the
duty to commission (Marbury v. Madison, 1 Cranch, 155)
would not carry with it or imply the existence of the pow-
er of removal.

The defendant further contends that Congress having
plenary power over the territories must in the exercise of
it be supposed to have preserved, through the executive
a "vein of power ascending to the general government"
so protected that it would not be open to attack and des-
truction by the people for whose restraint it was made.
Especially, it is urged, would Congress naturally take such
a course in the case of territory then but lately acquired
through war with a population hostile to our government.
There are some signs that, in recent years, there may have
beeen discovered, if it has not been actually reached, a
limit to the trustful good nature to which this Nation
has welcomed to the common table not only the people of
its acquired territory, but of all creation besides. At the
period when New Mexico became a territory such a limit
had, apparently, no place in our national policy. Supple-
menting a little the history of the times to which our at-
tention has been directed in behalf of the defendant, we
recall that even if the charge made against the political
party then dominant, that the war with Mexico was brought

on for the express purpose of providing space for the extension of slavery, was untrue, it must have been expected by the party leaders that in much of the territory acquired by the war slavery would prevail, that in New Mexico, peonage, a near relative of slavery had existed for generations, and that the doctrine "squatter sovereignty", as it was derisively called, was then, under the powerful leadership of Mr. Douglas, popular with the majority in Congress. That doctrine was thus stated by him in justification of the Organic Act for New Mexico with others of the same nature: "Every people should possess the right to form and regulate their own concerns and domestic institutions in their own way. These things are all confided by the Constitution to each state to decide for itself, and I know of no reason why the same principle should not be extended to the territories." From this combination of circumstances favorable to liberty in New Mexico what might have been expected, happened. As early as September, 1846, Gen. Stephen W. Kearny, the general commanding, established a civil government of a very liberal character for New Mexico, and even went so far as to proclaim at Santa Fe, a "Bill of Rights", in which he declared: "First, that all political power is vested in and belongs to the people." President Polk, in a message to Congress, which had asked for information on the subject, excused "any excess of power" which might have been exercised by military officers in the attempt to bestow political rights on people not citizens of the United States, on the ground that the "departure" was "the offspring of a patriotic desire to give to the inhabitants the privileges and immunities so cherished by the people of our own country, and which they believed calculated to improve their condition and promote their prosperity." In the Organic Act there is little trace of any disposition to repress or dominate the people of the Territory. "The vein of power ascending" to the government of the United States, several such veins, indeed, were preserved. The governor and the judges of the higher courts were to be appointed by the President. The governor was made an essential part of the legislative department, (Organic Act, Sec. 5) and finally, Congress reserved

to itself the right, which, as the court said in National
Bank v. County of Yankton, 101 U. S., 132, 133, it
had without reserving it, to annul all legislative acts which
should not meet with its approval.  Organic Act, Sec. 7.
But those were not unusual provisions in establishing civil
government for territories.     Very great liberality was
shown in the bestowal of the suffrage on all citizens by the
Organic Act.  The treaty of Guadalupe Hidalgo with Mex-
ico, February 2, 1848, had already provided that all who
remained in New Mexico for one year thereafter without
signifying their election to remain citizens of Mexico
should become citizens of the United States and have the
rights of such citizens.  Still Congress might doubtless have
limited the exercise of the right of suffrage if it had chos-
en to do so.  But not only did it authorize practically un-
limited suffrage (Organic Act, Sec. 6) and make the Con-
stitution of the United States the supreme law of the Ter-
ritory (Organic Act, Sec. 17),—it went so far as to provide
that when the Territory or any part of it should become a
state it should have slavery or not, as its constitution should
provide (Organic Act, Sec. 2); thus leaving to the peo-
ple of the Territory the settlement of that momentous ques-
tion for themselves.  And to such length did Congress go
in leaving to them the management of their own affairs
that it did not until 1867 by law abolish peonage, as until
then it had existed here, regulated and protected by Ter-
ritorial statutes.  That part of the original Territory of
New Mexico which still retains the name and Territorial
organization originally adopted by Congress has been for
more than half a century under a territorial govern-
ment.  In that time there has grown up a body of statute
laws dealing with all the principal matters which are sub-
jects of legislation in the different states of the Union.  In
only two instances in all that time has Congress seen fit
to annul a statute enacted by the Territorial Assembly.
That circumstance is cited not to show that only two laws
deserving of annulment have been made by the assembly—
probably there have been many such—but the more there
have been the stronger is the proof of the forbearing course
of the general government toward the people of this Terri-

tory. If the same power had existed over the legislation of the states, how many would have fared better in that respect?

The defendant attaches much importance to the fact that the people of the Territories are wholly dependent on the government of the United States for their political rights, which as the court declares, in Murphy v. Ramsey, 114 U. S., 44-5 are "franchises which they hold as privileges in the legislative discretion of the Congress of the United States". That the circumstance is highly significant in connection with this examination, we agree, but we think inferences are to be drawn from it quite different from those suggested by the defendant. This great power is held chiefly by Congress. In McAlister v. United States, 141 U. S. 174, the court said: "The decision in the present case is a recognition of the complete authority of Congress over Territorial officers in virtue of those general powers which that body possesses over the Territories of the United States, as Marbury v. Madison was a recognition of the power of Congress over the term of office of a justice of the peace for the District of Columbia." Congress, naturally, would not act in derogation of its own rights, especially when the effect would be to strengthen another branch of the government. It could not have intended to create a Territorial executive, to be appointed by the President, with power to nullify at will the elections by the people which it had authorized. Congress might no doubt have given the governor all the power which is claimed for him. It might also have governed the Territory by direct legislation, or through a commission, with no individual executive and without participation in the government by the people. But that Congress need not have given to the people of New Mexico a shred of self-government, is not at all inconsistent with the evident fact that it did give them a very large measure of self-government. "The Organic law of a territory takes the place of a constitution as the fundamental law of the local government." National Bank v. Yankton, supra. The political rights conferred by it are, in law, as secure and sacred as those guaranteed by the Constitution of

the United States, until they are, through legislation, withdrawn by the power which bestowed them.

Finally, it must be believed that Congress has had knowledge, actual as well as constructive, of what has transpired in New Mexico in relation to the matter of the governor's power to remove from office. The Organic Act, Sec. 7, provides that "all the laws passed by the legislative assembly and governor shall be submitted to the Congress of the United States and if disapproved shall be null and void". There has been such a law giving the governor the right to remove sheriffs from office, another taking away the right so given, and there is now such a law providing for the removal of sheriffs by the District Courts in certain cases. All these laws have, presumably, been submitted to Congress. Besides that, the question of the governor's power to remove has been at least three times before this court, has never been held to exist, and has once been denied. Territory v. Ashenfelter, supra, (1887) ; Conklin v. Cunningham, 7 N. M. 445 (1894) ; Eldodt v. Territory, 10 N. M. 141 (1900). The first named case went also to the Supreme Court of the United States, where it remained more than six years, was twice argued, twice ordered to be re-argued, once with notice to the Attorney General and was finally dismissed without a decision. The people of New Mexico are by no means wont to submit tamely to encroachment on what they conceive to be their rights, and in view of what is well known to be common practice it cannot well be doubted that some of these adversely affected by the proceedings, legislative and judicial, to which we have referred, appealed to Congress for help. Congress could at any time have interfered to annul the Territorial statutes on the subject, or to give the power of removal definitely to the governor. Its failure to act under such circumstances and for so long a space of time is strongly indicative of its acquiesence in the assumption by the assembly of the right to provide by legislation for removals from office. And it is, indeed, of a piece with the general policy of Congress not to interfere except in extreme cases with the conduct of the affairs of a territory by its people. It has considered and treated the Territorial form of gov-

ernment as a kind of training school for statehood; the Territory as the embryo of the future state—a state like its sister states in all essential particulars; not an autocracy, but a state to which the Nation must, under the Constitution, "guarantee a republican form of government". To that end it has been, no doubt, deemed advisable that the people of the Territories should to a great extent, suffer the consequences of their own errors of omission and commission in legislation and otherwise and learn, even at the cost of sore experience, to be self-governing, as the people of the states must be. To teach the people of a territory that they may elect unfit officers and rely on the executive over whom they have no direct control, to free them from the results of their own acts or negligence, it may naturally have been thought would lead them away from self-government and not toward it. Besides affording a training for statehood, the manner of dealing with such a subject by the people of the Territory furnishes for Congress an important test of their fitness for statehood.

We conclude, then, that the power to remove from office a lawfully elected sheriff in this Territory is not by the Organic Act vested in the governor, and that until otherwise provided by Congress, the legislative assembly has the right by appropriate legislation to determine the method of removal. Where the power is, there rests also the responsibility for its proper exercise. That a speedy and efficacious way for removing from office incompetent and dishonest officials is absolutely essential to good government there can be no doubt. Whether the existing method is adequate to the public needs,·it has not been necessary to consider in this cause.

The judgment of the District Court is reversed.